## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DISABILITY RIGHTS MARYLAND, INC.,<br>1500 Union Avenue, Suite 2000<br>Baltimore, MD 21211<br>Baltimore City | )<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:21-cv-02959-ELH |
| ROBERT L. GREEN, Secretary<br>Maryland Department of Public Safety and<br>Correctional Services,<br>in his official capacity,<br>6776 Reisterstown Road, Suite 309<br>Baltimore, MD 21215<br>Baltimore County | )<br>)<br>)<br>)<br>)<br>)<br>) |
| LYNDA M. BONIESKIE, Ph.D., Director of<br>Mental Health for the Office of Inmate Health and<br>Clinical Services<br>Maryland Department of Public Safety and<br>Correctional Services,<br>in her official capacity,<br>6776 Reisterstown Road, Suite 315<br>Baltimore, MD 21215<br>Baltimore County | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| CAROLYN J. SCRUGGS, Assistant Secretary of<br>Programs, Treatment, and Re-Entry<br>Maryland Department of Public Safety and<br>Correctional Services,<br>in her official capacity,<br>6776 Reisterstown Road, Suite 208<br>Baltimore, MD 21215<br>Baltimore County | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| WAYNE HILL, Deputy Secretary of Operations<br>Maryland Department of Public Safety and<br>Correctional Services,<br>in his official capacity,<br>6776 Reisterstown Road, Suite 208<br>Baltimore, MD 21215 | )<br>)<br>)<br>)<br>)<br>) |

1

Baltimore County

<table>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>And</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>MARYLAND DEPARTMENT OF PUBLIC</td><td>)</td></tr>
<tr><td>SAFETY AND CORRECTIONAL SERVICES</td><td>)</td></tr>
<tr><td>6775 Reisterstown Road,</td><td>)</td></tr>
<tr><td>Baltimore, MD 21215</td><td>)</td></tr>
<tr><td>Baltimore County</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Serve on:</td><td>)</td></tr>
<tr><td>STUART M. NATHAN, Principal Counsel</td><td>)</td></tr>
<tr><td>Office of the Attorney General</td><td>)</td></tr>
<tr><td>Department of Public Safety</td><td>)</td></tr>
<tr><td>and Correctional Services</td><td>)</td></tr>
<tr><td>300 East Joppa Road, Suite 1000</td><td>)</td></tr>
<tr><td>Towson, MD 21286</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants</td><td>)</td></tr>
</table>

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**PRELIMINARY STATEMENT**

1.      Disability Rights Maryland, Inc. ("DRM"), as an associational Plaintiff representing incarcerated persons with serious mental illness in segregation, seeks declaratory and injunctive relief to end Defendants' practice of confining individuals with serious mental illness in segregation conditions that violate our constitutional prohibitions against cruel and unusual punishment, and to require adequate mental health programming and services for such individuals. Plaintiff further seeks to end Defendants' discriminatory actions towards persons with serious mental illness in segregation, which include preventing such individuals from earning good-time credits, accessing needed programs and services, and from being housed in the most integrated setting appropriate to their needs.

2.      "Segregation," as used herein, refers to living in a cell approximately the size of a parking space for approximately 22 hours per day or more, with or without a cellmate. Cells are made of concrete and steel, have little natural light, and personal possessions are restricted. A hallmark of segregated confinement is the limitation on human engagement and purpose outside of one's cell. Hour upon hour of caged existence is spent in harsh conditions where persons with severe mental illness experience deterioration of their mental health, lack opportunities to experience wellness or recovery, and are at substantial risk of serious harm to their physical, emotional, and mental health.

3.     Defendants' records reveal the harmful consequences of segregated confinement on individuals with serious mental illness. Individuals experience hallucinations, spread their feces, bang their heads, engage in self-injurious behaviors, are actively psychotic, anxious, or depressed, experience social withdrawal, and/or have committed suicide.

4.     The most common forms of segregation in Maryland state prisons are administrative segregation and disciplinary segregation.

5.     "Disciplinary segregation" refers to segregation imposed for a period of time by Defendants after an individual is found guilty of committing an infraction of institutional rules. According to Defendants' policies, all individuals on disciplinary segregation are entitled to periodic showers, regular out-of-cell exercise periods, and provisions of needed health care. However, individuals with serious mental illness do not receive these opportunities consistent with Defendants' policies and constitutional obligations. Access to other prison programs, services, and opportunities is restricted.

6.     Disciplinary segregation sanctions can be imposed consecutively or concurrently with other sanctions. Defendants' policies allow for individuals with serious mental illness to be sanctioned up to 180 days per infraction.

7.     "Administrative segregation" may be imposed for a variety of reasons and for an indefinite period of time. Individuals may be placed in administrative segregation while awaiting transfer to a different facility, while an alleged infraction is investigated, for protective custody, or because they are considered a risk to the facility. Individuals in administrative segregation are allowed to keep more personal property in their cells than individuals in disciplinary segregation but are otherwise subject to living conditions similar to those found in disciplinary segregation.

8.     Individuals with serious mental illness can be detained for months and even years in segregation.

9.     On various occasions since 2016, Plaintiff Disability Rights Maryland has provided Defendant Secretary Green, his predecessor, and other officials of the Department of Public Safety and Correctional Services ("DPSCS") with information about the harms of segregation for those with a serious mental illness. DRM offered numerous times to meet with DPSCS officials about the conditions set forth in this Complaint. Despite these efforts, the unconstitutional practices and resulting harm alleged by Plaintiff have continued.

10.     Multiple correctional entities across the country have successfully modified their segregation practices for people with serious mental illness to provide alternatives to segregation and to offer adequate mental health treatment. Defendants have been informed of many such approaches and of the reported decrease in violence experienced in numerous jurisdictions that implemented segregation reforms.

11.     Plaintiff alleges that Defendants impose segregation with deliberate indifference to the actual harm and substantial risk of serious harm to individuals they know or should have known have serious mental illness. Plaintiff also alleges that Defendants act with deliberate indifference to the mental health needs of persons with serious mental illness in segregation by failing to provide necessary mental health services to such individuals.

12.     Plaintiff further alleges that Defendants engage in prohibited disability discrimination toward individuals with serious mental illness who are qualified individuals with disabilities under the Americans with Disabilities Act, 42 U.S.C §§ 12131-12134, and the Rehabilitation Act of 1972, 29 U.S.C. § 794.

13.     The correctional programs operated by Defendants and addressed in this Complaint include twelve state prisons identified below, but exclude Defendants' detention facilities, pre-release centers, and the Patuxent Institution.

14.     Plaintiff seeks relief for Defendants' actions and omissions that violate the rights of incarcerated individuals with serious mental illness as guaranteed by the Eighth Amendment to the United States Constitution, as applied to the states through the Due Process Clause of the Fourteenth Amendment, and as established by the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and the ADA's implementing regulations, 28 C.F.R. § 35, and the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794(b)(1), and the Rehab Act's implementing regulations, 28 C.F.R. § 42.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.     Plaintiff's claims are authorized by 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments of the United States Constitution, and Title II of the Americans with Disabilities Act, and the Rehabilitation Act. This Court has jurisdiction over such claims pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     This Court has the authority to award attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 12205,  42 U.S.C. § 1988, and 29 U.S.C. § 794(a).

18.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because Defendants' principal offices are located in this district and events described occurred in this district.

## PARTIES

19.     Plaintiff Disability Rights Maryland ("DRM") is the federally mandated Protection and Advocacy organization for the state of Maryland. The Protection and Advocacy System was established by Congress to protect the rights of persons with disabilities in each state. 42 U.S.C. §§ 15041, 10801. Every state has a Protection and Advocacy organization responsible for advancing and protecting the rights of persons with disabilities. DRM's responsibility to advocate for the rights of individuals with mental illness specifically includes individuals in state prisons. 42 U.S.C. § 10802(3).

20.     DRM has associational standing in this action based on its federal responsibilities and because:

    a.  The individuals whose rights DRM seeks to protect are individuals with disabilities in the state of Maryland.

b.  This action is germane to DRM's purpose and mission, which is to advocate for and protect individuals with disabilities across the state of Maryland.

c.  DRM is controlled by a Board of Directors who represent the needs of clients served by DRM. As required by federal law, DRM's Board of Directors includes significant representation of individuals with disabilities and family members of persons with disabilities.

d.  DRM has an advisory council composed of persons who are currently receiving services for their mental or behavioral health issues or who are involved with individuals with mental illness. The advisory council helps to establish service priorities for DRM. The Chair of the advisory council is on the DRM Board of Directors.

e.  DRM seeks input from its constituents in setting its service priorities, including input from individuals with disabilities, family members of people with disabilities, and organizations advocating for persons with disabilities.

f.  DRM has engaged in advocacy on multiple occasions over several years to protect the rights of incarcerated individuals with disabilities. This advocacy includes publishing reports, conducting outreach and education, commenting on Defendants' proposed regulations, and meeting with Defendants to advocate for individuals with disabilities in state custody.

g.  DRM has the right to pursue legal remedies on behalf of individuals with mental illness pursuant to 42 U.S.C. § 10805(a)(1)(B).

h.  DRM's advisory council and Board of Directors have authorized protecting the rights of people with disabilities in prisons as a priority advocacy area.

i.  DRM has interviewed over 150 incarcerated individuals and reviewed thousands of pages of Defendants' records related to incarcerated individuals with serious mental illness.

j.  DRM meets regularly with community advocacy groups who advocate for reform of prison conditions, and such groups include formerly incarcerated individuals and individuals with disabilities.

k.  DRM has a grievance process to ensure it operates on behalf of its clients.

l.  DRM possesses the indicia of a membership organization and thus fulfills the requirements for associational standing.

m.  Exemplars identified in this Complaint include individuals with serious mental illness who have been subject to segregation and have suffered physical, mental, or emotional harm as a result. These exemplars are nonexclusive examples of individuals who have suffered from conditions perpetuated by Defendants.

n.  DRM alleges that Defendants act with deliberate indifference to the constitutional rights of persons with serious mental illness in segregation and violate the rights of such individuals

as established by the Americans with Disabilities Act. DRM attempted to work with Defendants to resolve the issues raised in this Complaint for several years without adequate resolution.

21.     Defendant Robert L. Green is the Secretary of DPSCS. He is responsible for the operation, administration, and oversight of Maryland's system of corrections. He is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. He is sued in his official capacity.

22.     Defendant Lynda Bonieskie is the Director of Mental Health for the Office of Inmate Health and Clinical Services of DPSCS. She is responsible for the delivery of mental health programs and services, which include mental health crisis response, counseling services, treatment and diagnosis, and acute inpatient and outpatient care for individuals with serious mental illness in Defendants' custody. She is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. She is sued in her official capacity.

23.     Defendant Carolyn Scruggs is the Assistant Secretary of Programs, Treatment, and Re-Entry for DPSCS. She is responsible for DPSCS' programs and services intended to prepare incarcerated individuals to return to their communities. She is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. She is sued in her official capacity.

24.     Defendant Wayne Hill is the Deputy Secretary of Operations for DPSCS. He is responsible for DPSCS' Division of Corrections, the administrative unit responsible for correctional operations at every Maryland state correctional facility. He has the power to review or deny case management recommendations, including requests for disciplinary and administrative segregation. He is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which present harm or substantial risks of serious harm for such individuals. He is sued in his official capacity.

25.     Defendant DPSCS is a public entity organized under the laws of Maryland. One purpose of DPSCS is to operate state correctional facilities. DPSCS is a public entity for purposes of the Americans with Disabilities Act. DPSCS receives federal financial assistance to administer a program or activity. Based on the knowledge of its officials, DPSCS is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. DPSCS operates multiple facilities. The following facilities are the subject of this Complaint: Baltimore City Correctional Center, Dorsey Run Correctional Facility, Eastern Correctional Institution, Eastern Correctional Institution Annex, Jessup Correctional Institution, Maryland Correctional Institution - Hagerstown, Maryland Correctional Institution - Jessup, Maryland Correctional Institution for Women, Maryland Correctional Training Center, North Branch Correctional Institution, Roxbury Correctional Institution, and Western Correctional Institution. Defendants' detention facilities, pre-release centers, and the Patuxent Institution are excluded from this Complaint.

## FACTUAL ALLEGATIONS

### A.    THE BRUTAL CONDITIONS AND USE OF SEGREGATION

26.     Defendants know or should know, from medical, custodial, and other records, which individuals have a serious mental illness. Defendants detain such individuals in cells that are approximately the size of a parking space for, on average, twenty-two hours a day or more, either alone or with another individual. Beds are bolted into the concrete floor. A stainless-steel toilet and sink are also bolted to the floor. There is no privacy for using the toilet. In many facilities, cell door windows are small and are made of thick, shatter-resistant material. The cell doors are solid, which significantly blocks vision and light. The doors have cuff ports that can be opened to provide meals and to allow for handcuffing individuals before exiting. Essentially, segregation is prison within prison.

27.     In segregation, nearly all major life activities occur in the cell, including eating, sleeping, and using the toilet.

28.     Individuals in segregation generally cannot work at prison jobs, attend programs, or engage in other rehabilitative activities. They generally do not leave their cells to attend religious services, visit the library, receive medications, or to go to the dining hall, recreation yard, or gymnasium.

29.     Out-of-cell time is provided for recreation, often in outdoor segregation cages. Segregation cages are created to limit out-of-cell exercise interactions with others and are generally used for one or two cellmates. Those sharing cells in segregation must take recreation at the same time, limiting the ability for cellmates to have time and space away from one another. There is frequently no exercise equipment in the recreation cages. Out-of-cell time (fifteen minutes three times per week) is also provided for showers.

30.     Most segregation units are double- celled, meaning individuals are in extremely close and unbroken contact with one another. For many individuals with serious mental illness, the confined shared quarters in double-cell exacerbate their mental illness.

31.     Segregation units can be loud, and use of force incidents, including but not limited to pepper spray, cell extractions, and violence occur on the tiers.

32.     Segregation occurs in multiple places within Defendants' prison system and for multiple reasons.

33.     Defendants use disciplinary segregation as punishment for prison rule infractions. There is no aggregate time limit for which individuals may be in disciplinary segregation as individuals may acquire multiple sanctions and accumulate additional segregation time while in segregation.

34.     With very rare exceptions for a competency determination, there is no review required of an individual's mental health status or needs prior to being sent to disciplinary segregation.

35.     Defendants use administrative segregation for multiple reasons, including: as housing while a disciplinary complaint or security issue is being investigated; pending inter- or intra-facility transfers; to house persons needing protective custody; to confine individuals determined

to be a threat to facility security; and other reasons. There is no time limit for administrative segregation, and some individuals remain in this form of confinement for years.

36.     Other forms of segregation can include "cell restriction," which occurs in one's existing housing assignment. Examples include placement in special needs or special observation housing or on "staff alert," although uses of segregation in such settings are not as common as administrative and disciplinary segregation.

37.     The primary reason for leaving segregation is for showers or exercise. By policy, individuals in segregation are to be offered, at minimum, five 1-hour recreation periods per week. In reality, however, recreation is cancelled for assorted reasons, such as staff shortages, inclement weather or unit or facility incident or lockdown. Individuals with serious mental illness in segregation are not receiving out-of-cell time commensurate with Defendants' policies or constitutional obligations. As examples:

   a.   T.H.,[1] an individual with serious mental illness in segregation, spent 541 days in segregation, but according to Defendants' records, he was only offered an hour of recreation on 278 days — only 51% of his days in segregation. T.H. reported that he filed an Administrative Remedy Procedure ("ARP") claim because he was not receiving the care he was entitled to.

   b.   D.Z., an individual with a serious mental illness in segregation, spent 568 days in segregation, but according to Defendants' records, he was only offered an hour of recreation on 342 days — only 60% of his days in segregation.

   c.   A.G., an individual with serious mental illness in segregation, spent 889 days in segregation, but according to Defendants' records, he was only offered an hour of recreation on 471 days — only 53% of his days in segregation.

38.     Even when recreation is offered, some individuals in segregation refuse to participate because they must share the recreation cage with their cellmate, and they may need privacy or time away from a cellmate with whom they spend at least 23 hours per day. Individuals may also refuse recreation because of the limitations of opportunities in the cage or feelings of humiliation from being caged.

39.     At least one facility offered recreation time to individuals in segregation in the middle of the night, which is particularly difficult for individuals with serious mental illness taking evening medications that cause drowsiness, a side effect of many psychiatric medications.

40.     Indoor recreation is not available on all of Defendants' segregation units, further limiting opportunities for recreation and out-of-cell time, especially during inclement weather.

---

[1] Throughout this Complaint, where examples are provided, initials of incarcerated persons are used in place of full names for privacy reasons and due to the identification of individuals as seriously mentally ill.  Plaintiff will provide Defendants with the full names of all such identified examples used in this Complaint upon entry of an appropriate protective order.

41.     Personal property, including but not limited to family photos, and visitation can be limited or prohibited in segregation.

42.     Individuals with serious mental illness who are deemed to be in crisis, at risk of self-harm, or a danger to others may be placed in special observation housing where they may be denied underwear, socks, clothing, mattresses, and blankets. While designed to be of limited duration, some individuals spend weeks or months in such conditions.

43.     Segregation can be imposed for a finite term or without limitation. Although Defendants altered their disciplinary rules, effective 2018, to reduce segregation time for specific disciplinary infractions, Defendants did not cap the total time for cumulative disciplinary infractions; did not retroactively apply the changes; and did not require accommodations or programming for individuals with serious mental illness in segregation. Defendants do not have a limit on the number of days that individuals can be confined to administrative segregation.

44.     While time out-of-cell practices vary to a small degree among facilities or individual units, they are woefully inadequate and contribute to the destabilization, deterioration, and lack of recovery for individuals with serious mental illness.

45.     Access to other prison programming, including group or individual counseling, psycho-social or educational programming, jobs, or other meaningful activity is rare for individuals in segregation.

46.     Good-time credits cannot be earned in segregation and can be forfeited in disciplinary segregation.

47.     According to Defendants' own reports, DPSCS placed 812-individuals with serious mental illness in administrative or disciplinary segregation during fiscal year 2019 (the most recent available data). This represented 33.7% of the total prisoner population with serious mental illness. *See* Report on Restrictive Housing – Fiscal Year 2019, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Feb. 2020), http://goccp.maryland.gov/wp-content/uploads/SB-946-FY19-Restrictive-Housing-Report-FINAL.pdf.

### B.     SEGREGATION IS WIDELY KNOWN TO CAUSE HARM TO INDIVIDUALS WITH SERIOUS MENTAL ILLNESS.

48.     Segregation causes harmful physiological and psychological effects on people with serious mental illness. Commonly identified harms include depression, paranoia, aggression, lethargy, suicidal ideations, self-mutilation, hallucinations, hopelessness, and social withdrawal. Defendants are aware of these harmful effects.

49.     An article published in the American Journal of Public Health in 2015 stated, "Nearly every scientific inquiry into the effects of [segregation] over the past 150 years has concluded that subjecting an individual to more than 10 days of involuntary segregation results in a distinct set of emotional, cognitive, social, and physical pathologies." David Cloud et al., *Public Health and Solitary Confinement in the United States*, 105 AM. J. PUB. HEALTH 18 (Jan 2015). While this study addressed the harm of segregation on all incarcerated individuals, the effects of segregation

specifically for people with serious mental illness are even more pronounced and are well known to cause harm and substantial risk of serious harm.

50.     Research has led various professional mental and physical health, legal, human rights, and correctional organizations to call for elimination or severe limitations on the use of segregation for persons with serious mental illness due to the harms and serious risk of harms presented by the practice.

a.   The National Commission on Correctional Health Care, an organization of correctional health care practitioners, published a Position Statement on Solitary Confinement (adopted by its Board of Directors in April 2016), which states that "mentally ill individuals … should be excluded from solitary confinement of any duration." *See* Solitary Confinement (Isolation), NAT'L COMM. CORR. HEALTH CARE, https://www.ncchc.org/solitary-confinement.

b.   The American Psychiatric Association's Position Statement on Segregation of Prisoners with Mental Illness, approved in 2012, instructs:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/ psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals. *See* Position Statement on Segregation of Prisoners with Mental Illness, AM. PSYCH. ASS'N (Dec. 2012).

c.   The American Public Health Association published a policy statement in 2013 calling on correctional authorities to divert individuals with serious mental illness into secure treatment programs and to "eliminate [segregation] as a disciplinary sanction and create alternative means of discipline." *See* Solitary Confinement as a Public Health Issue, AM. PUB. HEALTH ASS'N (November 2013), https://apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue.

d.   In its 2016 "Report and Recommendations Concerning the Use of Restrictive Housing," the United States Department of Justice recognized that restrictive housing can cause serious, long-lasting harm and stated that individuals with serious mental illness should be diverted from segregation absent exigent circumstances, and if used, then supplemental programming is required. *See* Report and Recommendations Concerning the Use of Restrictive Housing, JUST. DEP'T (Jan. 2016), https://www.justice.gov/dag/file/815551/download.

e.   In 2018, the American Bar Association, recognizing the harm of segregation for individuals with serious mental illness, adopted a resolution urging the elimination of segregation for

individuals with an intellectual disability or serious mental illness. *See* Resolution No. 108A, ABA (Feb. 2018), https://www.americanbar.org/content/dam/aba/directories/policy/2018-midyear/2018-mm-108a.pdf.

f.   The United Nations adopted standard minimum rules for the treatment of prisoners in December 2015. Those rules specifically state that "the imposition of solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures." *See* Rule 45, United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. OFF. DRUGS & CRIME (Dec. 2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.

g.   The World Health Organization recognized in a 2014 publication that, "some individuals are particularly vulnerable to the negative effects of [segregation], including those with pre-existing mental and learning disabilities . . . . Experts largely agree that individuals with pre-existing mental illness are at a particularly high risk of worsening psychiatric problems as a result of their isolation." *See* Prisons and Health, WORLD HEALTH ORGANIZATION (Stefan Enggist, Lars Moller, Gauden Galea and Caroline Udesen, eds., 2014), https://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf.

h.   The Society of Correctional Physicians issued a position statement in 2013 acknowledging that "prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment." *See* Restricted Housing of Mentally Ill Inmates (Position Statement), SOC'Y CORR. PHYSICIANS (2013), http://accpmed.org/restricted_housing_of_mentally.php.

51.   Numerous correctional departments in other jurisdictions have reduced segregation for individuals with serious mental illness due to the harm such practices inflict. Studies of these efforts generally show a reduction or no increase in prison infractions.

52.   There is no doubt that individuals with serious mental illness ("SMI") in Defendants' facilities suffer harm in segregation, and the Defendants are aware, and at all times hereto were aware, of these attendant harms but nevertheless continue to place inmates with SMI in segregation conditions. The Defendants' inadequate policies and practices with respect to inmates with disabilities have been the subject of previous lawsuits, legislative hearings, and proposed legislative action, documented in reports made by the Department of Public Safety and Correctional Services, and Administrative Remedy Procedure ("ARP") actions.

a.   *Skinner v. Liller*, No. CV TDC-17-3262, 2021 WL 1062003, at *10 (D. Md. Mar. 19, 2021) (denying Correctional Defendants' motion for summary judgment regarding claims of prolonged administrative segregation and inadequate mental health treatment).

b.   *Rogers v. Dep't of Public Safety & Correctional Servs., Robert L. Green, O. Wayne Hill, Carolyn E. Scruggs, et al.*, Complaint, ECF No.1, 1:19-cv-03090-JKB (D. Md.

Oct. 23, 2019) (claims under the ADA, Rehab Act, 42 U.S.C. § 1983 (Eighth and Fourteenth Amendment), and Maryland Declaration of Rights to redress widespread pattern and practice of constitutional violations against prisoners with disabilities).

c. Restrictive Housing Reform Act: Hearing on House Bill 742: Corrections - Restrictive Housing - Serious Mental Illness - Assessments Before the Judiciary Committee (statements of Green, Bonieskie, and Wayne Hill) (Feb. 25, 2020), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&clip=JUD_2_25_2020_meeting_1&ys=2020rs.

53.    Individuals with serious mental illness report that symptoms such as hallucinations and suicidal thoughts occur more frequently and more intensely when they are in segregation than when they are not housed in such restrictive conditions.  For example, A.T. is an individual with serious mental illness who has spent at least 51 months in segregation since 2014 and experienced auditory hallucinations, increased anxiety, paranoia, and depression from his segregation conditions.  A.T. informed the Defendants of the harmful consequences of segregation in the form of multiple ARPs.  A.T. is in segregation and denied the benefits of programming, solely due to his disability.

54.    Some individuals with serious mental illness decompensate while in segregation such that they rarely leave their cells. As an example, records of one individual, W.C., show that he only took 69 total showers and came out of his cell for recreation only 5 days out of nearly 1,500 days in segregation.

55.    Courts recognize the harm attendant to segregation. The Court of Appeals for the Fourth Circuit recently held that the conditions of segregated confinement on Virginia's death row created a substantial risk of serious psychological and emotional harm for incarcerated individuals and that the actions of prison officials violated the Eighth Amendment by confining individuals to cells for at least 23 hours per day. *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019), *as amended* (May 6, 2019). The Court recognized the harm and inhumanity of segregation restrictions for individuals permanently assigned to such conditions. The case did not address individuals with serious mental illness, who are universally recognized to be at the greatest risk of serious psychological harm when in segregation.

a. "Research has shown that the impacts of solitary confinement can be similar to those of torture and can include a variety of negative physiological and psychological reactions. These effects are amplified in individuals with mental illness and can exacerbate underlying conditions, especially in people with intellectual disabilities." *Latson v. Clarke,* 249 F. Supp. 3d 838, 847 (W.D. Va. Apr. 20, 2017).

b. *Scott v. Clarke*, 61 F. Supp. 3d 569, 583 (W.D. Va. 2014) ( "[C]ourts routinely certify class actions . . . challenging prison . . . mental health care") (citation and internal quotation marks omitted).

c. *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1098 (W.D. Wis. 2001) ("Most inmates have a difficult time handling these conditions of extreme social isolation and sensory deprivation, but for seriously mentally ill inmates, the conditions can be

devastating.").

    d.   *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1100 (E.D. Cal. 2014)  ("[T]he Eighth Amendment prohibits placements of seriously mentally ill inmates in conditions that pose a substantial risk of exacerbation of mental illness, decompensation, or suicide.").

56.    Two recent Supreme Court cases decided in 2015 gave Justices the occasion to comment on the psychological harms caused by segregation.  *Davis v. Ayala*, 576 U.S. 257, 286 (2015) (Kennedy, J., concurring) ("Years on end of near-total isolation exact a terrible price."); *Glossip v. Gross*, 576 U.S. 863, 925 (2015) (Breyer, J., dissenting, joined by Ginsburg, J.) ("[I]t is well documented that . . . prolonged solitary confinement produces numerous deleterious harms."). And more recently one Justice noted that "segregated confinement imprints on those that it clutches a wide range of psychological scars." *Apodaca v Raemich*, 139 S. Ct. 6, 9 (2018) (statement of Sotomayor, J., respecting denial of certiorari).

57.    As explained by the Court of Appeals for the Third Circuit:

> [Solitary confinement] is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage.  Specifically . . . researchers found that virtually everyone exposed to such conditions is affected in some way . . . . Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results.

*Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549, 566–67 (3d Cir. 2017).

58.    While the Eighth Amendment "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Plaintiff alleges that the conditions imposed by Defendants on persons with serious mental illness in segregation are inhumane and constitutionally impermissible.

59.    The Eighth Amendment also requires the provision of minimally adequate mental health care for all incarcerated persons. Such care is particularly important for persons with serious mental illness and even more so when they are detained in segregation. As set forth below, Defendants fail to provide adequate mental health care to individuals with serious mental illness in segregation.

### C.    DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE TO INDIVIDUALS WITH SERIOUS MENTAL ILLNESS IN SEGREGATION.

60.    The well-established harm of segregation for individuals with severe mental illness is made more acute by Defendants' failure to provide minimally adequate mental health care. Taken as a whole, Defendants' mental health services are grossly inadequate and deny access to necessary care. The limited or non-existent treatment opportunities, exclusive of psychiatric medication, cause deterioration in mental health status and delays in recovery, and they pose a substantial risk of serious psychological and emotional harm.

61.     While Defendants provide mental health "rounds" to individuals in segregation, these are cell-front checks during which a health professional inquires about the status of individuals through brief questions shouted through the cell door, generally a steel door. Rounds do not provide treatment and they are not confidential. The conversations occur in the presence of other incarcerated individuals, cellmates, and custody staff.

62.     Incarcerated individuals with serious mental illness require treatment to ensure their illness is not exacerbated. Adequate health care is particularly necessary for individuals with serious mental illness in segregation to help them manage symptoms, such as anger, frustration, paranoia, depression, and behaviors that lead to prison infractions or a cycle of segregation.

a.  In May 2020, after spending a month in segregation, B.D., an individual with a serious mental illness, asked to see someone for his mental health issues. He reported that he felt "depressed and stressed out" and said, "I don't do nothing. Can't do nothing. I think about suicidal every day. All day." Defendants placed him in special observation housing as a suicide precaution. His next interaction with a mental health provider occurred during a cell side visit the next day. He was observed to be naked, with a rolled ball of feces on his windowsill. He placed the ball of feces in his mouth when asked to dispose of it. He refused food and his insulin. He denied suicidal ideation and observation was reduced. The next day he had another cell side visit from a third mental health professional. B.D. agreed to eat and take his medications. Records noted that "staff will continue to monitor his behavior and encourage healthy habits" and that he would continue in special observation status through the weekend. No mental health services were offered over the weekend, and he was returned to his segregation status the next week. Despite his known mental illness, suicidal statements and bizarre behavior, no individual counseling services were provided. After B.D. returned to segregation, no structured group services of any kind were available.

b.  In June 2019, A.G., an inmate with serious mental illness who has spent considerable time in segregation, was placed on special observation housing ("SOH") after he reported hearing voices and not receiving his medications for more than a week. DPSCS records noted that A.G. had not received his medications.  A.G. reported to the prison that when he does not receive his medications, he has auditory and visual hallucinations. According to DPSCS records, A.G. was reportedly placed in SOH either for being suicidal or for wanting to kill his cell mate. His medications were provided to him while he spent three days in SOH.  A.G. was discharged from SOH without an individual treatment plan.

c.  C.C. spent nearly a year in segregated confinement awaiting a psychiatric evaluation to appraise him for a decrease in security level.  C.C. presented to the psychology department on August 19, 2019, to discuss concerns with his medications and his intensifying mental health symptoms, including impaired sleep. He reported filing multiple ARP claims. While C.C. was advised that counseling was effective for his disorder, he was also told that counseling was not currently available at the correctional facility. For nearly five months, C.C. was not offered an individual appointment with the psychology department staff, despite continuing to raise concerns related to his mental health to the Defendants.

63.     Defendants' failure to provide adequate care includes: the failure to provide necessary treatment opportunities and access to programs; the failure to provide individual treatment plans and services; and the failure to properly diagnose individuals with serious mental illness.

### i.     Defendants' failure to provide adequate treatment and programming.

64.     Mental health treatment, staffing, and programming provided by Defendants are woefully insufficient to protect the mental health of individuals with serious mental illness in segregation. The consequence is a constitutionally deficient system of care that inflicts serious harm and/or poses a substantial risk of serious harm for individuals with severe mental illness.

65.     The chief services offered to address the mental health needs of individuals with serious mental illness in segregation are medication administration and mental health checks or "rounds."

66.     Individuals with serious mental illness in segregation may decompensate and become increasingly ill, but do not receive necessary treatment. They may spend lengthy periods in isolated confinement while markedly mentally ill without receiving necessary treatment or release from their segregation setting.

67.     Defendants have limited options to provide services or to transfer individuals with serious mental illness who require an inpatient hospitalization level of care. As a result, some persons with serious mental illness who need such care are denied or receive delayed necessary services.

68.     At some of Defendants' prisons, individuals with serious mental illness in segregation receive no regular treatment services except for medication management.

69.     At some of Defendants' prisons, individuals with serious mental illness are meant to receive counseling once a month, but this care is often disrupted for various reasons.

70.     While an appointment with psychology may be requested by an incarcerated individual by making a sick call request or upon referral from custody staff, individuals with serious mental illness in segregation fail to receive the requisite counseling and programming, and provision of services is restricted due to staffing limitations.

71.     Mental health services and individual therapy are not provided based on individual needs, and services are not offered in a timely or consistent manner.

72.     Numerous individuals in segregated confinement with serious mental illness report repeated requests to speak with a mental health professional following feelings of depression, anxiety, or other mental health symptoms. However, they either did not receive such services or did not receive them in a timely manner.

73.     Adequate treatment for individuals with serious mental illness includes, but is not limited to:  psychosocial or rehabilitation services, such as individual and group therapy sessions; structured out-of-cell activities designed to provide psychoeducational opportunities; and social interaction activities and opportunities for unstructured activities to promote stability and decrease psychiatric symptoms.  Defendants fail to provide adequate treatment and services.

74.     Without therapy and treatment programs, individuals suffer harm, are at substantial risk of serious deterioration, and cannot advance in their recovery.

75.     Staff shortages contribute to the Defendants' failure to deliver adequate services. Many facilities have significant vacancies in social work and/or psychology positions.

76.     At least three DPSCS facilities, each housing more than 1,000 individuals, had only one position filled in each of their respective psychology departments in 2021. Some psychology vacancies have remained unfilled for prolonged periods, sometimes *years*.

77.     Defendants provide some direct services, but also rely on a contract with a private for-profit company to deliver mental health services. DPSCS' audit of its mental health contractor from April 2018 to September 2018 found that mental health positions were 16% below the contractually obligated staffing requirements. The mental health contractor subsequently forfeited $1,512,469 in liquidated damages for its failure to provide adequate staffing levels.

78.     The lack of mental health services contributes to an overreliance on segregation as a means of managing persons with serious mental illness. In fiscal year 2018, DPSCS reported that 230 individuals with serious mental illness were placed in administrative or disciplinary segregation. *See* Report on Restrictive Housing – Fiscal Year 2018, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Jan. 2019), http://goccp.maryland.gov/wp-content/uploads/dpscs-restrictive-housing-report-2018.pdf. In fiscal year 2019 (the latest data available), the reported number of individuals with serious mental illness in administrative or disciplinary segregation was 812. *See* Report on Restrictive Housing – Fiscal Year 2019, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Feb. 2020), http://goccp.maryland.gov/wp-content/uploads/SB-946-FY19-Restrictive-Housing-Report-FINAL.pdf. Although the Maryland General Assembly requires DPSCS to report annually on the numbers of individuals with serious mental illness in segregation, DPSCS has not provided such report for fiscal year 2020.

79.     There is insufficient staff to provide mental health and related services and to enable the safe movement and monitoring of individuals with serious mental illness in segregation.

80.     Existing mental health services have been denied or canceled because of a lack of staff to transport individuals in segregation to the health care provider or program activity.

81.     In fiscal year 2018, DPSCS returned over $11 million in general funds due to unfilled salary positions. According to a report by the Department of Legislative Auditors in 2017, Defendants had the highest employee vacancy rates of any executive department.

82.     While many individuals with serious mental illness in segregation receive psychiatric medication, Defendants fail to ensure that medication intervention is appropriately paired with other clinical and program services necessary to provide adequate treatment.

83.     Medications may be increased based on an individual's complaints of worsening symptoms. However, this increase is not accompanied by a plan for contact by a mental health counselor to see if the medication change is effective or if other intervention is necessary. For example, E.B. was incarcerated at the Maryland Correctional Institution for Women in 2017 when she began complaining of worsening symptoms of depression. E.B. had a documented history of

suicide attempts and psychiatric hospitalizations prior to her incarceration. Shortly before her placement in segregation, records show that she reported sleeping more and not getting up or out of her cell. In response to her concerns, her antidepressant medication was increased, but she received no follow-up counseling or mental health intervention despite her known depression, increase in symptoms, and increase in medications. E.B. was placed in disciplinary segregation for a minor rule infraction on November 10, 2017, and subsequently hanged herself on November 12, 2017. Multiple women on her tier reported that prior to her suicide she repeatedly pleaded to speak to someone from mental health services. No counseling services were provided.

### ii.    Defendants fail to provide individual treatment plans and services.

84.    Defendants fail to provide minimally adequate treatment plans for individuals with serious mental illness in segregation.

85.    Even when treatment plans are in place, they frequently do not conform to professional standards of care. For example, treatment plans recurrently contain no criteria by which to measure progress, are not regularly updated, lack specific treatment interventions, and fail to identify individuals responsible for treatment. Without identification of specific interventions, these documents fail to constitute "treatment plans."

   a.    A treatment plan for J.S., an individual with a serious mental illness, who has spent time in segregation, identified a treatment problem as "impulse control problems" with a corresponding goal of "no assaultive behavior." However, the plan fails to identify any treatment, services, or intervention strategies to achieve the goal and did not identify anyone responsible for providing mental health services, programming, or resources to address the problem or to achieve the goal.

   b.    A treatment plan for B.D., an individual with a serious mental illness, who has spent time in segregation, identified a treatment problem as "depression," with a corresponding goal to "alleviate depression symptoms." The same plan identifies a second treatment problem as "mood swings," with a corresponding goal of a "decrease in mood swings."  The plan fails to identify any treatment, services, or intervention strategies to achieve the goals and does not identify anyone responsible for providing mental health services, programming, or resources to address the problems or to achieve the goals.

86.    Even individuals with serious mental illness who have been placed in special observation housing (special observation housing is extremely restricted cell confinement used to monitor individuals in crisis or who present a danger to self) or on suicide watch have been discharged from such status without an adequate written treatment plan, and sometimes without any written treatment plan at all.

87.    Defendants' policies require individual treatment plans for persons who have received mental health services more than four times over the course of a two-month period. Maryland Department of Public Safety and Correctional Services Directive 124-425, *Individual Treatment Plans*, Mental Health Services (Dec. 20, 2000). However, such definition ties treatment needs to actual services provided by Defendants instead of the clinical needs of the individual. If Defendants fail to provide mental health services, then according to Defendants' policies, they do

not need to provide treatment plans. Such a policy leaves individuals with serious mental illness in segregation exposed to harm and substantial risk of serious harm.

88.     Defendants' failure to provide adequate health care includes that Defendants do not require individualized treatment plans for persons with serious mental illness in segregation; and when treatment plans exist, Defendants fail to ensure that the plans meet professional standards of care. Further, the treatment plans do not appear to be regularly reviewed for quality compliance or coordinated with medication management.

### iii.     Defendants fail to properly identify individuals with serious mental illness.

89.     Defendants under-identify individuals with serious mental illness and fail to provide appropriate care for all individuals with serious mental illness in segregation.

90.     Defendants fail to use adequate psychological histories and assessments to provide a context and proper diagnosis for individuals with serious mental health needs.

91.     Defendants use an inappropriate definition of "serious mental illness."

92.     Defendants define "serious mental illness" as characterized by an impaired role in functioning on a continuing or intermittent basis for at least two years, based on the limitations set forth in COMAR 10.21.17.02, which states:

(a) Manifest in an individual 18 years old or older;
(b) Diagnosed, according to a current diagnostic classification system that is recognized by the Secretary as:
    (i) Schizophrenic disorder;
    (ii) Major affective disorder;
    (iii) Other psychotic disorder; or
    (iv) Borderline or schizotypal personality disorder, with the exclusion of an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct; and
(c) Characterized by impaired functioning on a continuing or intermittent basis, for at least 2 years, and includes at least three of the following:
    (i) Inability to maintain independent employment;
    (ii) Social behavior that results in interventions by the mental health system;
    (iii) Inability, due to cognitive disorganization, to procure financial assistance to support living in the community;
    (iv) Severe inability to establish or maintain a personal support system; or
    (v) Need for assistance with basic living skills.

93.     Defendants' definition for identifying individuals is inappropriate because:

a.  It relies on a functioning assessment that is simply inapplicable in a prison environment. For instance, individuals with serious mental illness in prison cannot demonstrate that they qualify for many of the above-stated criteria in COMAR 10.21.17.02(c) because while in prison, they lack the opportunity to establish independent employment and independent financial support in the community or the ability to maintain a personal support system.

b.  The definition uses overly restrictive and limiting diagnostic classifications.

94.  The failure to properly identify individuals with serious mental illness is further evidenced by Defendants' specious reporting of the number of seriously mentally ill incarcerated individuals:

a.  In 2011, DPSCS stated that there were only 280 individuals with serious mental illness out of nearly 23,000 incarcerated individuals — about 1.2% of Defendants' total population. *See* Inmate Mental Health Care Services Request for Proposals, Solicitation No.: DPSCS Q001002014, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Dec. 7, 2011), https://dbm.maryland.gov/contracts/Documents/ContractLibrary/DPSCS/InmateMentalHealth/InmateMentalHlthRFPAmd1_7.pdf.

b.  In 2015, DPSCS reported that there were 947 incarcerated persons with serious mental illness, or approximately 4.3% of the total prison population. *See* Letter from Stephen T. Moyer, Secretary, Dep't Pub. Safety & Corr. Servs. to The Honorable Bobby A. Zirkin, Chairman, Jud. Proc. Comm. (Oct. 15, 2015).

c.  In 2016, DPSCS reported that there were 1,468 incarcerated persons with serious mental illness, or roughly 7.2% of the total prison population. *See* Report on Restrictive Housing – Fiscal Year 2016, MD. DEP'T PUB. SAFETY & CORR. SERVS. (2016), https://goccp.maryland.gov/wp-content/uploads/dpscs-restrictive-housing-report-2016.pdf.

d.  In 2018, DPSCS identified 3,017 individuals as seriously mentally ill, approximately 11.1% of the prison population.  *See* Report on Restrictive Housing – Fiscal Year 2018, MD. DEP'T PUB. SAFETY & CORR. SERVS. (2018), http://goccp.maryland.gov/wp-content/uploads/dpscs-restrictive-housing-report-2018.pdf.

e.  In 2019, DPSCS identified 2,406 individuals with a serious mental illness out of 24,431 total individuals housed, or 9.8% of the prison population.  *See* Report on Restrictive Housing – Fiscal Year 2019, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Feb. 2020), http://goccp.maryland.gov/wp-content/uploads/SB-946-FY19-Restrictive-Housing-Report-FINAL.pdf.

95.  Human Rights Watch and several academic studies estimate that the average percentage of individuals with serious mental illness in jails and prisons is 15%–20%.

96.  The American Psychiatric Association has estimated that approximately 20% of individuals in American prisons have a serious mental illness.

97.  The National Commission on Correctional Health Care issued a report to Congress in which it estimated that 17.5% of individuals in state prisons had schizophrenia, bipolar disorder, or major depression.  *See* The Health Status of Soon-To-Be-Released Inmates, 2 NAT'L COMM'N. CORRECTIONAL HEALTH CARE 64 (Apr. 2002), https://www.ncchc.org/filebin/Health_Status_vol_2.pdf.

98.  DRM provided DPSCS officials with information regarding the inappropriate definition used by Defendants, and further shared definitions used by several other state corrections entities.

These definitions could lead to more accurate identification of persons with serious mental illness. DRM has also reported publicly on Defendants' under-counting of persons with serious mental illness and provided such reports to Defendant Green and other DPSCS officials.

99.     Defendants are aware of the inaccurate identification of people with serious mental illness but continue to rely on a diagnostic scheme that fails to identify those individuals who are most seriously harmed by Defendants' segregation practices.

100.    Without addressing the needs of individuals with serious mental illness in their custody, Defendants will continue to provide inadequate staffing and programming to those who require such services.

101.    The failure to properly identify individuals with serious mental illness, the use of improper definitions, and lack of proper screening and identification of individuals with serious mental illness exhibit deliberate indifference to the health care needs of such individuals. Those who are confined in segregation with undiagnosed serious mental illness are at substantial risk of serious harm due to the conditions of segregation combined with Defendants' failure to provide minimally adequate mental health care.

   a.   For years, L.P. was not identified as seriously mentally ill by Defendants at North Branch Correctional Institution despite his extensive history of mental health diagnosis and treatment in the community. He received psychiatric medications while in Defendants' custody, and his records demonstrate that he reported hearing voices; engaged in self-injurious behaviors; isolated himself in his cell for long periods of time, only once leaving his segregation cell in a thirty-day period; exhibited very poor hygiene; and, at times, refused to eat or communicate. Only after years of segregation, and advocacy by Disability Rights Maryland, was he identified as seriously mentally ill. Ultimately, he was transferred to Patuxent Institution for more intensive mental health services, where he currently remains.

102.    Viewed in its totality, the health care services provided by Defendants for individuals with serious mental illness fail to provide essential components necessary to meet constitutionally adequate standards of care. Defendants are aware of their failure to provide programming, treatment, and mental health services to those with serious mental illness in segregation but do nothing to diminish the harms and risks posed to those individuals.

### D.   DEFENDANTS ARE DELIBERATELY INDIFFERENT TO THE SERIOUS HARM AND SUBSTANTIAL RISK POSED TO INDIVIDUALS WITH SERIOUS MENTAL ILLNESS IN SEGREGATION, INCLUDING THEIR FAILURE TO PROVIDE CONSTITUTIONALLY MANDATED CARE.

103.    Beginning in 2017, Disability Rights Maryland ("DRM") submitted documentation to Defendants detailing specific policies, practices, and examples of individuals with serious mental illness being harmed by Defendants' segregation practices. DRM issued two public reports detailing the need for Defendants to reform their mental health and segregation practices related to individuals with serious mental illness. The reports alleged Defendants' actions violate the Americans with Disabilities Act and the Eighth Amendment of the U.S. Constitution.

104.   DRM provided Defendants with information and policies from other state departments of corrections and the Federal Bureau of Prisons and suggested specific remedial actions for the Defendants to take.

105.   DRM has repeatedly invited Defendants to collaborate in remedying these findings and has met with DPSCS officials on several occasions, but Defendants have failed to adequately address the needs of individuals with serious mental illness and the rights violations set forth in this Complaint.

106.   Both the National Institute of Corrections and the Vera Institute of Justice observed the Defendants' segregation practices and urged reforms to reduce the harmful effects of such practices. The Vera Institute of Justice reviewed Defendants' use of segregation in adult prisons and in a 2012 study found a "startling" lack of mental health staff and programming, which the study determined contributed to Maryland's over-reliance on segregation. The Vera Institute study recommended developing alternative programs for individuals with challenging behaviors. *See* Preliminary Findings: Review of Maryland Dep't Pub. Safety and Correctional Servs. and Use of Segregation in Adult Prisons, VERA INST. JUST. (2012), https://d3n8a8pro7vhmx.cloudfront.net/interfaithaction/pages/13/attachments/original/14120269 36/VERA_study_-_Review_of_MD_Use_of_Segregation_in_Adult_Prisons.pdf?1412026936. In 2015, the National Institute of Corrections recommended developing alternative housing programs for persons with behavioral issues and individuals with serious mental illness. *See* Report on Restrictive Housing – Fiscal Year 2016, MD. DEP'T PUB. SAFETY & CORR. SERVS. (2016), https://goccp.maryland.gov/wp-content/uploads/dpscs-restrictive-housing-report-2016.pdf.

107.   Defendants acknowledge the need for individualized accommodations. Defendants' Special Needs Identification policy requires the identification of individuals with special needs for the purpose of developing policy, programming, and procedures to meet those needs. By this very policy, Defendants affirm their obligation to provide proper identification and programming for individuals with special needs. Unfortunately, Defendants fail to provide the requisite consideration and accommodations to satisfy the needs of those with serious mental illness.

108.   Defendants are aware of other states' correctional initiatives to decrease the use of segregation for persons with serious mental illness. These initiatives correspond to a reduction in prison infractions, or, at minimum, no increase in infractions — the programs generally did not compromise prison safety but instead increased prison security as the needs of persons with serious mental illness were addressed.

109.   Several federal courts found that conditions in segregation can result in significant psychological damage and increase the risk of harm, in violation of the Eighth Amendment. Plaintiff has shared several such decisions with Defendants.

110.   Beginning in 2016, Defendants provided oral and written statements to the Maryland General Assembly indicating that DPSCS would develop programs for persons with serious mental illness and take steps to improve conditions for individuals with serious mental illness in segregation. These promised changes were not implemented. Indeed, between 2016 and 2019, the proportion of the population of inmates with SMI in segregation rose from 11.7% to 33.7%. *See*

Report on Restrictive Housing – Fiscal Year 2016, MD. DEP'T PUB. SAFETY & CORR. SERVS. (2016), https://goccp.maryland.gov/wp-content/uploads/dpscs-restrictive-housing-report-2016.pdf; Report on Restrictive Housing – Fiscal Year 2019, MD. DEP'T PUB. SAFETY & CORR. SERVS. (Feb. 2020), http://goccp.maryland.gov/wp-content/uploads/SB-946-FY19-Restrictive-Housing-Report-FINAL.pdf.

111.    The segregation conditions imposed by Defendants on persons with severe mental illness serve no penological interest. As the Defendants' own policy states, "punishment is ineffective in modifying the behavior of the mentally ill." DPSCS Doc. 124.0541, Special Needs Unit Program Manual, at 4.

112.    Defendants systematically fail to provide the required mental health care to individuals with serious mental health illness in segregation. The Defendants are aware that the conditions of segregation, including the lack of human contact, lack of exercise, lack of environmental stimulation, cell conditions, and oppressive security measures, subject individuals with SMI to a substantial risk of serious harm. The systemic deficiencies identified by Plaintiff demonstrate that Defendants are deliberately indifferent to the conditions and health care needs of individuals with serious mental illness in segregation.

113.    Despite having the authority to correct the unconstitutional practices and prohibited disability discrimination, as described herein, Defendants have failed to do so.  Defendants place inmates with SMI in segregation for months and years without adequate health care or access to services or programs. The Defendants have failed to intervene to prevent known physical and mental risks to inmates suffering from already debilitating SMI, which causes and exacerbates their behaviors.

114.    Defendants repeatedly receive notice of the harms of isolation through complaints they receive each year from people in segregation through DPSCS' administrative grievance process. Individuals with serious mental illness describe the mental health and physical health consequences that they are experiencing. Defendants' typical response is to ignore the suffering they describe.

115.    Plaintiff has no adequate remedy at law to obtain relief from the violations alleged in this Complaint.  Defendants have noted in responses to administrative complaints submitted by individuals with serious mental illness in restrictive housing that the ARP process is not an appropriate method to address their concerns.

116.    Individuals in segregation with serious mental illness suffer, and will continue to suffer, irreparable injury and substantial risk of serious harm as a result of the acts and omissions of Defendants.

### E.    DEFENDANTS ENGAGE IN PROHIBITED DISABILITY DISCRIMINATION.

117.    The ADA provides that no qualified individual with a disability shall be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity because of their disability. 42 U.S.C. § 12132. In relevant part, the ADA's implementation regulations, 28 C.F.R. § 35.101 *et. seq.*, provide that public entities: (a) shall not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or

service," 28 C.F.R. § 35.130(b)(1)(i); and (b) "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the [DOC] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity[.]" 28 C.F.R. § 35.130(b)(7). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

118.    Individuals with serious mental illness are persons with disabilities as defined by the ADA. 42 U.S.C. §§ 12131-12134. The incarcerated persons with serious mental illness that DRM represents are qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104. These individuals have mental impairments that substantially limit one or more major life activities, including but not limited to thinking, concentrating, and interacting with others, including their ability to control their behavior; and they have records of having such an impairment, or they are regarded as having such an impairment.

119.    The ADA and Rehab Act apply to prisons. *Pennsylvania DOC v. Yeskey*, 524 U.S. 206 (1998); *Cutter v. Wilkinson*, 544 U.S. 709, 716 n.4 (2005) ("Every State . . . accepts federal funding for its prisons."). DPSCS is a public entity within the meaning of and subject to Title II of the ADA.

120.    Defendants' ADA obligations are not limited when individuals with disabilities are placed in segregation.

   i.    **Defendants exclude individuals with serious mental illness from participating in services, programs, or activities on the basis of their disability and fail to provide such individuals with services in the most integrated setting appropriate to their needs.**

121.    DPSCS is, and at all times relevant hereto was, aware of the serious mental illness of the individuals with serious mental illness in segregation that DRM represents, and has failed to implement reasonable modifications to policies, practices, or procedures needed in order for these individuals to enjoy meaningful access to services, programs, and activities and to avoid discrimination on the basis of disability. DPSCS has violated, and continues to violate, the rights of these individuals by failing to provide reasonable modifications to policies, practices, or procedures in order to proscribe discrimination against individuals with mental illness.

122.    By placing individuals with serious mental illness in segregation, Defendants limit access for such individuals to prison programs including: earning good-time credits; having a job; earning money; increasing their opportunities for successful parole; participating in mental health services or programs; educational programs, vocational programs, psychoeducation programs, and religious programs; recreation programs, communal dining, and other opportunities. Individuals subject to disciplinary or administrative segregation face the additional harm of being denied parole based on their segregation history, which can be attributed to behavior related to their serious mental illness.

123.    Defendants administer segregation in a manner that discriminates against individuals with serious mental illness by placing them in segregation due to their mental illness and denying them opportunities for services, including mental health services, that are available to persons not placed in segregation.

    a.    For example, A.T. frequently talks aloud to himself, which is a documented symptom of his serious mental illness. He was previously assaulted by a cellmate after he would not cease talking to himself. He fears further abuse due to his disability related behavior if he is returned to the general population. He is anxious. For a period, Defendants offered A.T. a program that provided opportunities for out-of-cell counseling and programming. A.T. benefited from the services, but worried about returning to general population housing upon completion of the program. Defendants informed A.T. that he would have to withdraw from the treatment program if he did not agree to return to the general population. A.T. continues to remain in segregation as he refuses to move to the general population due to his distrust of his peers and fear that he cannot function in the general population because of his serious mental illness.  A.T. continues to accrue disciplinary segregation time for his refusal. He has been denied regular mental health services with the exception of medication in segregation. A.T. reports that his command hallucinations, anxiety, paranoia, and depression have become worse in segregation, and he wants treatment and programming. His disability-related needs are not considered or accommodated while he is in segregation.

124.    Defendants fail to reasonably assess and account for mental illness and do not consider whether an individual's segregation placement (or status in segregation) is due to their mental health diagnosis and/or attendant clinical manifestations, nor do Defendants consider whether the individual can be served in an integrated setting that is appropriate to their needs.  *See* 28 C.F.R. § 35.130(d).

125.    In prison, persons with serious mental illness (particularly those without adequate mental health care) suffer psychiatric deterioration and engage in symptomatic behaviors. which may include aggressive presentation; acts of self-mutilation; depression, isolation and withdrawal; failure to keep clean and other unhygienic behavior; smearing feces on themselves and their cells; throwing urine or feces; setting fires; screaming; refusing to follow orders; and flooding their cells with water from the toilet. These behaviors, frequently symptomatic of serious mental illness, can lead to placement in disciplinary segregation for violation of prison rules based on the action or a refusal to follow orders, or they may lead to placement in administrative segregation or special observational housing. Individuals with serious mental illness in segregation may be sentenced to additional periods of segregation for engaging in symptomatic conduct related to their disability.

    a.    For example, D.S. is an individual diagnosed with serious mental illness who has spent more than 1,000 days in segregation since 2015. D.S. struggles to express himself in an appropriate manner due to his mental health issues and is repeatedly placed in segregation as a result of symptoms and manifestations of his disabilities, such as smearing feces, banging his head on his cell, etc. These behaviors have progressed and occur more often as D.S. continues to accrue time in segregation. D.S.'s behavior was caused by and is intrinsically linked to his disabilities, of which Defendants knew.  Defendants fail to provide mental health services or programming that would otherwise be available to D.S.

while he is in segregation, because of his SMI.  Defendants are subjectively aware of the harms from this segregation.

126.    The ADA and Rehab Act require that Defendants provide services to individuals with serious mental illness in the most integrated setting appropriate to their individual needs. Segregation, with its attendant isolation and lack of programming, is not the most appropriate or integrated setting for individuals with serious mental health disabilities.

127.    Defendants' eligibility criteria and methods of administration discriminate against persons with serious mental illness by housing them in segregation without regard for the Defendants' obligation to integrate such individuals as much as possible and as appropriate to the individual's needs.

### ii.    Defendants fail to modify their policies to accommodate individuals with serious mental illness prior to and during placement in segregation, and fail to provide reasonable accommodations in violation of 28 C.F.R. § 35.103(b)(7).

128.    Defendants are, and at all times were, aware of the mental illness of DRM's constituents. For example, the Defendants have received ARP complaints based on these conditions, and they have been the subject of lawsuits.[2] Nevertheless, Defendants fail to identify individuals with serious mental illness prior to their placement in segregation, or to modify their segregation practices to allow individuals with serious mental illness to access otherwise available services, programs, and activities in the prison system. *See, e.g.*, *Latson*, 249 F. Supp. 3d at 857 (holding prisoner with mental illness sufficiently stated claims under ADA and Rehab Act).

129.    By subjecting individuals with disabilities to unnecessary and punitive segregation, without considering modifications or reasonable accommodations based on the individualized needs of people with serious mental illness, Defendants unreasonably and illegally restrict those individuals' access to participate in services, programs, or activities offered by Defendants because of their disability.  Essentially, the Defendants deny individuals with SMI any accommodations for their disabilities.

130.    With regard to disciplinary segregation:

   a.   DPSCS fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, or procedures in connection with issuing *disciplinary* tickets, preventing individuals from progressing through administrative segregation, or otherwise keeping them in segregated confinement when they are subject to prolonged, and oftentimes indefinite, isolation from the general prison population.  For example, Defendants do not require consideration of whether a rule infraction by an individual with serious mental illness is related to his or her disability.

---

[2] D.Z. filed suit previously and the Court, noting mental health concerns that were potentially affecting his safety, ordered DPSCS to provide a report addressing D.Z's mental and physical health; DPSCS filed more than 300 pages of D.Z.'s medical and mental health records. Defendants were therefore aware of the deleterious effects of segregation on D.Z. specifically, in addition to their knowledge of the deleterious effects on seriously mentally ill inmates generally.

b. There is no required determination of whether a sanction for an alleged infraction could be mitigated with reasonable accommodations in order to offer opportunities for services or housing in a more integrated setting appropriate to the individual's serious mental health needs.

c. Allegations of disciplinary infractions are considered by prison hearing officers. Defendants do not alert hearing officers when the individual has a serious mental illness. Defendants do not permit hearing officers access to the individual's mental health records. Moreover, hearing officers are not trained in mental health. Thus, hearing officers are unable to provide necessary modifications in segregation practices to individuals with serious mental illness.

d. Individuals with serious mental illness may behave in ways that are interpreted as violations of prison rules rather than as a manifestation of their mental health problems, which can lead to placement in segregation where conditions can exacerbate the individual's symptoms and mental illness. For some individuals, a deterioration of mental health results in their being less able to abide by prison rules, and they accrue additional infractions, which extends their time in segregation. It is a vicious cycle. Absent modification in Defendants' policies and practices, individuals with serious mental illness suffer in segregation with no viable pathway out and are repeatedly subject to extensive periods of segregation due to their disability.

e. D.Z. is an individual with serious mental illness and has a long-documented history of auditory hallucinations. During a disciplinary hearing this individual stated that "the computers in the room were pulling the thoughts out of [his] head." The hearing officer, who is not a qualified mental health professional and did not have access to DZ's history and mental health records, determined that the individual "was faking and exaggerating mental illness." No program modifications or accommodations were provided to this individual, who was subsequently found guilty and sent to disciplinary segregation solely because of his disability. Defendants failed to accommodate D.Z.'s disability-related behavior so that he could have a fair hearing and obtain treatment services in a setting appropriate to his needs, and subjected D.Z. to discrimination.

131.   With regard to special observation housing or "suicide prevention" cells, Defendants fail to modify their policies to provide reasonable accommodations based on the individual's needs. For example, Defendants generally remove an individual's clothing, including socks and underwear, and do not require the provision of blankets or mattresses. Defendants do not require an individualized threat assessment to justify such extreme actions, nor do they require the modification of policies for individuals with serious mental illness.

132.   Defendants can reasonably modify their segregation practices to provide critically needed services for individuals with serious mental illness. Defendants have repeatedly stated that they would do so but have not fulfilled such promises.

133.   Prison systems across the county have successfully modified segregation practices for individuals with serious mental illness.

134.    Defendants already have programs in several prisons that provide some accommodations/services for individuals with mental illness; elements of such programs can be replicated or modified to assist in the delivery of needed mental health services to persons with serious mental illness in segregation.

135.    Under the prior DPSCS administration, and after consulting with DRM, Defendants initiated a special program to provide mental health services to individuals with serious mental illness in segregation. This program was created at one prison to get individuals with serious mental illness out of their cells and into therapeutic activities. The existence of this program, and other programs such as special needs units and mental health programs available in some of Defendants' facilities, demonstrates that modifications can be made to Defendants' existing segregation policies to accommodate individuals with serious mental illness.

136.    Defendants' methods of administration substantially impair their programs' ability to accomplish their goals.

137.    The harm from Defendants' discriminatory actions in failing to modify segregation policies and failing to provide services in the most integrated settings is exacerbated by Defendants' failure to create a viable process for providing individual reasonable accommodations as required by the ADA.

138.    Defendants are required to have an ADA Coordinator to ensure that individuals with disabilities receive reasonable accommodations, avoid discrimination based on disability, and receive equal access to prison services and programs. Individuals with disabilities in segregation have not been provided with instruction or education regarding their right to request reasonable accommodation or how to contact the facility's ADA Coordinator.

139.    Defendants' "Inmate Handbook," provided to all individuals in their custody, fails to provide information about the right of an individual with disabilities to request reasonable accommodation and how to contact the ADA Coordinator.

140.    Individuals with serious mental illness in segregation are unaware of their right to request reasonable accommodations. Disability Rights Maryland engaged in over 150 interviews with incarcerated persons in segregation and reviewed thousands of records, and not once was there an acknowledgment that reasonable accommodations could be or were requested.

141.    Defendants' failure to establish a meaningful reasonable accommodations process results in denying persons with serious mental illness their rights to be accommodated pursuant to the ADA.

### iii.    Defendants' segregation program is administered in a discriminatory manner that disproportionately impacts people with disabilities.

142.    Defendants fail to properly identify individuals with serious mental illness as detailed in Paragraphs 1 through 139 of this Complaint. Defendants' policies and practice of under-identifying individuals with serious mental illness deprive such individuals of the accommodations, modifications, and protections promised by the ADA.

143.    Even with a clear under-counting of individuals with serious mental illness, Defendants' segregation practices have a discriminatory and disparate impact on people with serious mental illness. In 2015, 15.5% of all incarcerated individuals with serious mental illness, as diagnosed by Defendants, were placed in administrative and disciplinary segregation. During the same period, Defendants' data demonstrates that 7.7% of all incarcerated individuals without a serious mental illness were placed in administrative and disciplinary segregation. *See* Letter from Stephen T. Moyer, Secretary, Dep't Pub. Safety & Corr. Servs. to The Honorable Bobby A. Zirkin, Chairman, Jud. Proc. Comm. (Oct. 15, 2015). The most recent publicly available data reveals that in fiscal year 2019, 33.7% of all incarcerated individuals with serious mental illness, as diagnosed by Defendants, were placed in administrative and disciplinary segregation. During the same period, Defendants' data demonstrates that 19.1% of all incarcerated individuals without a serious mental illness were placed in administrative and disciplinary segregation. Defendants' policies and practices have a disparate impact on persons with serious mental illness.

144.    Defendants impose longer average segregation sentences on persons with serious mental illness as compared to their non-disabled peers. *See* Letter from Stephen T. Moyer, Secretary, Dep't Pub. Safety & Corr. Servs. to The Honorable Bobby A. Zirkin, Chairman, Jud. Proc. Comm. (Oct. 15, 2015).

| Average Length of Stay (Days) on: | All Incarcerated Individuals | Incarcerated Individuals with SMI |
|---|---|---|
| Administrative Segregation | 130 | 228 |
| Disciplinary Segregation | 124 | 224 |

145.    Defendants discriminate against individuals with SMI solely based upon their disability by placing them in segregation following manifestations of their disabilities and holding them for extended periods of time without access to mental health care or medications, knowing their mental conditions and behaviors are exacerbated by segregation. Defendants' practices and policies result in a disparate impact and disparate treatment of persons with serious mental illness and violate federal civil rights laws.

146.    Defendants' methods of administration result in prohibited disability discrimination, as defined by the ADA and the Rehabilitation Act.


## CLAIMS FOR RELIEF

### COUNT I

Violation of the 8th and 14th Amendments of the United State Constitution; 42 U.S.C. § 1983

147.    Plaintiff incorporates Paragraphs 1 through 146 of this Complaint herein.

148.    Defendants, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DPSCS' policies, customs, and practices, cause

individuals with serious mental illness in segregation to be subjected to actual harm and pose a substantial risk of serious harm by subjecting mentally ill inmates to segregation in conditions that violate the Eighth Amendment's prohibition on cruel and unusual punishment, enforceable through 42 U.S.C. § 1983.

149.     Defendants, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DPSCS' policies, customs, and practices, have subjected incarcerated individuals with serious mental illness to dangerous and degrading treatment, caused them serious pain and injury, placed them at a substantial risk of serious physical harm and psychological injury, have acted and continue to act with deliberate indifference to the mental health needs of individuals with serious mental illness in segregation and the provision of adequate care, have acted contrary to standards of decency, and have denied incarcerated individuals with serious mental illness the minimal civilized measure of life's necessities.

150.     Defendants' practices, acts, and omissions have been and continue to be implemented by Defendants and their agents, contractors, employees, and all others acting in concert with them under the color of state law and in their official capacities. Defendants have authorized, condoned, and failed to exercise their supervisory authority to prevent incarcerated persons with serious mental illness from being subjected to cruel and unusual punishment by their agents, officials, employees, and others acting in concert with them under color of state law, and are continuing to authorize, condone, and fail to exercise their supervisory authority to stop that illegal practice.

151.     Defendants, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DPSCS' policies, customs, and practices, knew and continue to know the risks to the health, safety, and serious medical needs of incarcerated persons with serious mental illness but have disregarded that risk and failed to take any reasonable measures to abate that risk.

152.     Defendants' acts and omissions are the proximate cause of harm and the ongoing deprivation of rights secured by the Eighth Amendment.

## COUNT II

Violation of the 8th and 14th Amendments of the United State Constitution; 42 U.S.C.§ 1983

153.     Plaintiff incorporates Paragraphs 1 through 152 of this Complaint herein.

154.     Defendants' policies, practices, and actions subject individuals with serious mental illness in segregation to actual harm and pose a substantial risk of serious harm.  This is because of the Defendants' failure to provide minimally adequate mental health care in violation of the Eighth Amendment, enforceable through 42 U.S.C. § 1983.

155.     Defendants have acted and continue to act with deliberate indifference to the mental health needs of individuals with serious mental illness in segregation and to the provision of inadequate care.

156.     Defendants' acts and omissions are the proximate cause of harm and the ongoing deprivation of rights secured by the Eighth Amendment.

157.    Defendants' practices, acts, and omissions have been and continue to be implemented by Defendants and their agents, contractors, employees, and all others acting in concert with them under the color of state law and in their official capacities.

## COUNT III

Violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

158.    Plaintiff incorporates Paragraphs 1 through 157 of this Complaint herein.

159.    Defendants' policies, practices, and actions discriminate against individuals with serious mental illness in segregation.

160.    Through custody, health care, and other records, Defendants know, or should know, that individuals with serious mental illness are in segregation.

161.    Defendants have failed to make necessary program modifications and accommodations to address the rights and needs of individuals with serious mental illness in segregation to have meaningful access to services, programs, and activities, despite their affirmative obligation to do so under the ADA.  Further, Defendants fail to provide treatment in the most integrated setting.

162.    By subjecting individuals with disabilities to unnecessary and punitive segregation, without considering modification or accommodations or the individual needs of individuals with serious mental illness, Defendants unreasonably and illegally restrict their access to participate in services, programs, or activities offered by Defendants due to their disability.

163.    Defendants' actions and methods of administration have an illegitimate and disparate impact on individuals with serious mental illness.

164.    Defendants' failure to comply with ADA requirements, and provide accommodations and modifications of its policies and practices for qualified individuals with disabilities, results in prohibited disability discrimination, deprives individuals of access to services and treatment, and compounds the harmful conditions of restrictive housing.

165.    Defendants' identified practices, acts, and omissions have been and continue to be implemented by Defendants.

## COUNT IV
Violations of Section 504 of the Rehabilitation Act of 1973 29 U.S.C. § 794

166.    Plaintiff incorporates Paragraphs 1 through 165 of this Complaint herein.

167.    Individuals with serious mental illness housed in facilities administered by Defendants are qualified individuals with disabilities within the meaning of Section 504. They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, and interacting with others, including their ability to control their

behavior; and they have records of having such an impairment, or they are regarded as having such an impairment.

168.    Defendants administer programs and activities in their incarceration facilities that receive federal financial assistance. *See, e.g.*, Fiscal 2022 Budget Overview, MD. DEP'T PUB. SAFETY & CORR. SERVS (Feb. 2022), https://mgaleg.maryland.gov/pubs/budgetfiscal/2022fy-budget-docs-operating-Q00-DPSCS-Overview.pdf.

169.    Defendants, by subjecting individuals with serious mental illness to conditions of segregation, exclude these individuals from participation in, deny them the benefits of, and discriminate against them with respect to services, programs, and activities, including educational, vocational, recreational, and health care services.  Defendants deny individuals with serious mental illness in restrictive housing units the benefits of these services due to behavior directly attributable to their mental illness that would not manifest but for their mental illness, thus discriminating against individuals with serious mental illness solely on the basis of their disabilities.

170.    Defendants further discriminate against individuals with SMI by failing to offer or to provide reasonable accommodations, which are necessary for these individuals to enjoy meaningful access to services, programs, and activities, and to avoid discrimination solely on the basis of disability.

171.    Due to the behaviors that manifest from these individuals' mental illnesses, Defendants place individuals with serious mental illness into restrictive housing at higher rates and for longer periods than Defendants place those without SMI, thus discriminating against them solely on the basis of their disabilities.

172.    Defendants' failure to meet their obligations to individuals with SMI constitutes ongoing and continuous violations of Section 504 and its supporting regulations, and continues to inflict irreparable harms on these inmates solely on the basis of their disability. Unless enjoined, Defendants will continue to violate Section 504 and to inflict injuries for which inmates with SMI have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

A.    A Judgment in its favor and against Defendants;

B.    A declaration that Defendants' acts and omissions violate the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act, and that these acts and omissions continue to cause an ongoing violation of those rights;

C.    An Order enjoining Defendants and their agents, employees, officials, and all persons acting in concert with them, from engaging in illegal and unconstitutional acts, omissions, policies, and practices by, among other things, enjoining Defendants from placing individuals with serious mental illness in restrictive housing; and requiring Defendants to ensure that individuals with serious mental illness receive adequate mental health care and services;

D.     An Order requiring Defendants to timely submit a Corrective Action Plan for approval by Plaintiff's Counsel and this Court to eliminate the substantial risk of serious harm suffered by those incarcerated individuals with serious mental illness represented by Disability Rights Maryland. At a minimum, the Corrective Action Plan ("Plan") shall include:

     a.    Plans for eliminating the use of segregation for individuals with serious mental illness except in exigent circumstances where individuals pose a documented serious threat of harm and to minimize any time in segregation and maximize access to programming and recreation for these individuals. The Plan shall require reporting and oversight of the use of segregation and exceptions.

     b.    Commitments to increase, by specific numbers, the number of trained correctional officers to ensure the safety and rights of incarcerated individuals with serious mental illness;

     c.    A commitment to increase specific mental health services and therapeutic activities, including individual and group therapeutic activities, confidential programming, and adequate individualized treatment plans;

     d.    The provision of training and publications to staff and incarcerated individuals related to the Americans with Disabilities Act ("ADA"); establishing a process for filing and tracking requests for reasonable accommodations and for accessing the facility ADA Coordinator;

     e.    Modification of the current disciplinary procedures to require identification and diversion of individuals with serious mental illness from segregation;

     f.    Proper screening and identification of individuals with serious mental illness, including individuals with developmental disabilities;

     g.    Development of a quality assurance system to regularly assess activities and services provided to individuals with serious mental illness; and

     h.    Retention of a court expert monitor to assist in the development of the Corrective Action Plan and to oversee its implementation.  This includes making regular reports to the parties and this Court on Defendants' progress in implementing changes to the Plan and issuing written recommendations for the successful implementation of the Plan's goals and objectives.

E.     An Order that Defendants, and their agents, employees, officials, and all persons acting in concert with them, implement the approved Corrective Action Plan.

F.     An Order that this Court retain jurisdiction over this case until Defendants have demonstrated full compliance with the Orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future.

G.     An order awarding Plaintiff costs, reasonable attorneys' fees, and litigation expenses pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12205; 29 U.S.C. § 794(a); and other applicable laws.

H.      Such other relief as this Court deems just and proper.


Respectfully submitted this 1st day of February, 2022.


_____/s/_____
Luciene Parsley, Federal Bar No. 27089
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Email: MunibL@disabilityrightsmd.org
Telephone: 410-727-6352 ext. 2494
Facsimile: 410-727-6398


_____/s/_____
Munib Lohrasbi, Federal Bar No. 21923
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Email: MunibL@disabilityrightsmd.org
Telephone: 410-727-6352 ext. 2491
Facsimile: 410-727-6398


_____/s/_____
Michael L. Hecht, Federal Bar No. 26174
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email:  mhecht@venable.com
Telephone: 410-244-7572
Facsimile: 410-244-7742


_____/s/_____
Thomasina E. Poirot, Federal Bar No. 30090
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email:  tepoirot@venable.com
Telephone: 410-244-7574
Facsimile: 410-244-7742


_____/s/_____
Alissa N. Portner, Federal Bar No. 21402
Venable LLP

750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email:  anportner@venable.com
Telephone: 410-244-7815
Facsimile: 410-244-7742