**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

|  |  |  |
|---|---|---|
| DISABILITY RIGHTS MARYLAND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-02959-ELH |
| | ) | |
| ROBERT L. GREEN, | ) | |
| LYNDA M. BONIESKIE, | ) | |
| CAROLYN J. SCRUGGS, | ) | |
| WAYNE HILL, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MARYLAND DEPARTMENT OF PUBLIC | ) | |
| SAFETY AND CORRECTIONAL SERVICES, | ) | |
| | ) | |
| Defendants | ) | |

_____


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I. INTRODUCTION ......................................................................................................... 1

II. SUMMARY OF DRM'S CONSTITUTIONAL ALLEGATIONS ........................................ 2

III. LEGAL STANDARD ................................................................................................... 3

IV. ARGUMENT ............................................................................................................... 5

    A. DRM's Claims are Not Barred by the Eleventh Amendment ............................. 5

        1. DRM Has Identified Continuing Violations of Federal Law Committed
           by Defendants. ............................................................................................ 5

        2. The Requested Relief Would Serve Directly to Bring an End to
           Present Violations of Federal Law ............................................................. 7

    B. Defendants Violated and Continue to Violate the Eighth Amendment's
       Prohibition on Cruel and Unusual Punishment (Count I). ................................. 9

        1. The Conditions of Maryland's Prisons Pose a Substantial Risk of
           Serious Harm. ............................................................................................ 10

        2. Defendants Are Deliberately Indifferent to the Substantial Likelihood
           of Harm. ..................................................................................................... 14

    C. Defendants Fail to Provide Minimally Adequate Mental Health Care to
       Inmates with Serious Mental Illness, in Violation of the Eighth Amendment
       (Count II). ........................................................................................................ 16

        1. Serious Mental Illness Constitutes a "Serious Medical Need." ................ 17

        2. Defendants Are Deliberately Indifferent to the Mental Health Needs
           of Incarcerated Persons with Serious Mental Illness. ............................... 17

    D. Defendants Discriminate Against Incarcerated Individuals with Serious
       Mental Illness in Segregated Housing by Engaging in Disability
       Discrimination in Violation of the ADA and the Rehabilitation Act
       (Counts III and IV) .......................................................................................... 20

        1. Defendants Violated and Continue to Violate Title II of the ADA
           (Count III). ................................................................................................. 20

        2. Defendants Violated and Continue to Violate the Rehabilitation Act
           (Count IV). ................................................................................................. 25

        3. DRM Has Alleged Facts That Plausibly Demonstrate Violations of the
           Fourteenth and Eighth Amendments, and Defendants Are Not Entitled
           to Sovereign Immunity. ............................................................................. 26

        4. The Requested Relief Correlates to Defendants' Large-Scale
           Constitutional Violations ........................................................................... 28

E. DRM Has Standing to Enforce the Rights of Its Constituents............................................. 29

    1. DRM's Unique Role Confers Standing to Bring Suit on Behalf of its Members .................................................................................................................. 30

    2. DRM is Not Required to Allege a Particularized Injury on Its Own Behalf........................................................................................................................ 33

    3. Exhaustion of Administrative Remedies is Not Required in this Case ...................... 34

V. CONCLUSION................................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Balt. Cnty.,*
    515 F.3d 356 (4th Cir. 2008) ........................................................................ 21

*Advocacy Ctr. for Elderly & Disabled v. La. Dep't of Health & Hosps.,*
    731 F. Supp. 2d 583 (E.D. La. 2010) ........................................................ 30, 32

*Aiken v. Nixon,*
    236 F. Supp. 2d 211 (N.D.N.Y. 2002) ............................................................ 33

*Alabama Disabilities Advoc. Program v. Wood,*
    584 F. Supp. 2d 1314 (M.D. Ala. 2008) ........................................................ 34

*Alexander v. Choate,*
    469 U.S. 287, 301 (1985) ................................................................................ 26

*Antrican v. Buell,*
    158 F. Supp. 2d 663 (E.D.N.C. 2001) .............................................................. 8

*ARC v. Dallas County Mental Health,*
    19 F.3d 241 (5th Cir. 1994) ............................................................................ 30

*Armstrong v. Schwarzenegger,*
    622 F.3d 1058 (9th Cir. 2010) .................................................................. 24, 28

*Ash v. Maryland Transit Admin.,*
    No. CV ELH-18-1216, 2019 WL 1129439 (D. Md. Mar. 12, 2019) .............. 26

*Barber v. Colo. Dep't of Revenue,*
    562 F.3d 1222 (10th Cir. 2009) ...................................................................... 8

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................................... 4

*Blankumsee v. Galley,*
    2016 WL 270073 (D. Md. Jan. 21, 2016) ........................................................ 6

*Bragg v. W. Va. Coal Ass'n,*
    248 F.3d 275 (4th Cir. 2001) ............................................................................ 5

*Braggs v. Dunn,*
    257 F. Supp. 3d 1171 (M.D. Ala. 2017) ........................................ 8, 18, 29, 32

*Brown v. Plata,*
    563 U.S. 493 (2011).................................................................... 17, 28, 29

*Cabrales v. City of Los Angeles,*
    865 F.2d 1454 (9th Cir. 1988) ...................................................... 18

*Cmty. Legal Aid Soc'y v. Coupe,*
    2016 WL 1055741 (D. Del. Mar. 16, 2016) .................................. 32

*Coleman v. Brown,*
    28 F. Supp. 3d 1068 (E.D. Cal. 2014)........................................... 11

*Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut,*
    706 F. Supp. 2d 266 (D. Conn. 2010)............................................ 32

*Constantine v. Rectors & Visitors of George Mason Univ.,*
    411 F.3d 474 (4th Cir. 2005) .......................................... 23, 25, 28

*Cortez v. Prince George's Cty.,*
    31 F. App'x 123 (4th Cir. 2002) .................................................... 4

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1996) ......................................................... 8

*Cunningham v. BOP,*
    222 F. Supp. 3d 959 (D. Colo. 2015)............................................ 33

*Davenport v. DeRobertis,*
    844 F.2d 1310 (7th Cir. 1988) ..................................................... 14

*DeBauche v. Trani,*
    191 F.3d 499 (4th Cir. 1999) ......................................................... 5

*DePaola v. Clarke,*
    884 F.3d 481 (4th Cir. 2018) ....................................................... 19

*Disability Rights N.Y. v. New York,*
    2019 WL 2497907 (E.D.N.Y. June 14, 2019) .............................. 32

*Disability Rts. Cal. v. Alameda,*
    2021 WL 212900 (N.D. Cal. Jan. 21, 2021).................................. 32

*Disability Rts. Montana, Inc. v. Batista,*
    930 F.3d 1090 (9th Cir. 2019) .................................. 2, 9, 10, 12, 13, 16, 17, 34

*Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.,*
    2020 WL 1491186 (M.D. Pa. Mar. 27, 2020) ................................................. 32

*Doe v. Stincer,*
    175 F.3d 879, 886 (11th Cir. 1999) ..................................................... 30, 31, 33

*Dunn v. Bishop,*
    2018 U.S. Dist. LEXIS 138815 (D. Md. Aug. 14, 2018) ............................... 16

*Dunn v. Dunn,*
    318 F.R.D. 652 (M.D. Al. 2016) ................................................................ 25

*Edwards v. City of Goldsboro,*
    178 F.3d 231 (4th Cir. 1999) ...................................................................... 4

*EEOC v. Allegheny Cty.,*
    705 F.2d 679 (3d Cir. 1983) ........................................................................ 8

*Ervin v. Corizon Health,*
    No. CV ELH-21-2386, 2021 WL 5760728 (D. Md. Dec. 3, 2021) ................. 20

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ..................................................................................... 9

*Ex parte Young,*
    209 U.S. 123 (1908) ........................................................................... 5, 7, 8

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................................................. 10

*Fink v. Richmond,*
    DKC-07-0714, 2008 WL 9364730 (D. Md. Mar. 24, 2008) .......................... 26

*Fisher v. Oklahoma Health Care Auth.,*
    335 F.3d 1175 (3d Cir. 2003) .................................................................... 24

*Furgess v. Pa. Dep't of Corr.,*
    933 F.3d 285 (3d Cir. 2019) ...................................................................... 25

*Gibbs v. Pittsburgh,*
    989 F.3d 226 (3d Cir. 2021) ........................................................................ 8

*Goldstein v. Coughlin,*
    83 F.R.D. 613 (W.D.N.Y. 1979) ................................................................ 33

*Greason v. Kemp,*
    891 F.2d 829 (11th Cir. 1990) ....................................................... 16

*Harvard v. Inch,*
    411 F. Supp. 3d 1220 (N.D. Fla. 2019)........................................... 21

*Helen L. v. DiDario,*
    46 F.3d 325 (3d Cir. 1995 ............................................................... 23

*Helling v. McKinney,*
    509 U.S. 25 (1993)............................................................... 9, 10, 14

*Honig v. Doe,*
    484 U.S. 305 (1988)......................................................................... 34

*Hunt v. Wash. Apple Adver. Comm'n,*
    432 U.S. 333, 343–45 (1977).............................................. 30, 31, 32

*Hutto v. Finney,*
    437 U.S. 678 (1978)......................................................................... 11

*In re Long Term Administrative Segregation of*
    *Inmates Designated as Five Percenters,*
    174 F.3d 464 (4th Cir. 1999) ........................................................... 10

*Ind. Prot. & Advocacy Servs. Comm'n v. Indiana DOC,*
    642 F. Supp. 2d 872 (S.D. Ind. 2009) ....................................... 32, 33

*Innes v. Bd. of Regents of Univ. Sys. of Maryland,*
    29 F. Supp. 3d 566, 577 (D. Md. 2014)......................................... 25

*Laflamme v. New Horizons, Inc.,*
    605 F. Supp. 2d 378 (D. Conn. 2009).............................................. 32

*LaMarca v. Turner,*
    995 F.2d 1526 (11th Cir. 1993) ....................................................... 19

*Latson v. Clarke,*
    249 F. Supp. 3d 838 (W.D. Va. 2017) ............................................ 28

*Lewis v. Cain,*
    2021 U.S. Dist. LEXIS 63293 (M.D. La. Mar. 31, 2021) ............... 23

*Liberty Res., Inc. v. Phila. Hous. Auth.,*
    528 F. Supp. 2d 553 (E.D. Pa. 2007) .............................................. 32

*Lonergan v. Fla. Dept. of Corr.,*
    623 F. App'x 990 (11th Cir. 2015) ................................................................ 21

*Madrid v. Gomez,*
    889 F. Supp. 1146 (N.D. Cal. 1995) ................................................. 17, 18, 19, 29

*Makdessi v. Fields,*
    789 F.3d 126 (4th Cir. 2015) ........................................................................ 16

*Mary Jo C. v. N.Y. State & Local Ret. Sys.,*
    707 F.3d 144 (2d Cir. 2013)............................................................................ 8

*Maryland Comm. Health Sys. v. Glendening,*
    115 F. Supp. 2d 599 (D. Md. 2000) ............................................................... 8

*McCartney v. Cansler,*
    382 F. App'x 334 (4th Cir. 2010) ................................................................... 7

*Missouri Protection and Advocacy Services, Inc. v. Carnahan,*
    499 F.3d 803 (8th Cir. 2007) ........................................................................ 30

*Mosier v. Kentucky,*
    675 F. Supp. 2d 693 (E.D. Ky. 2009) ........................................................... 26

*N.J. Prot. & Advocacy, Inc. v. Davy,*
    2005 WL 2416962 (D.N.J. Sept. 30, 2005) ................................................... 33

*N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.,*
    563 F. Supp. 2d 474 (D.N.J. 2008) ............................................................... 32

*Natl Fed'n of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ........................................................................ 20

*Oregon Advocacy Center v. Mink,*
    322 F.3d 1101 (9th Cir. 2003) (same)..................................................... 30, 32

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998)...................................................................................... 20

*Papasan v. Allain,*
    478 U.S. 265, 278 (1986)................................................................................ 8

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ........................................................................ 11

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................................................... 7, 8

*Pierce v. County of Orange,*
    761 F. Supp. 2d 915 (C.D. Cal. 2011) ............................................ 29

*Pinkett v. Crowder,*
    No. CIV.A. ELH-13-2509, 2014 WL 3571802 (D. Md. July 18, 2014). .......................... 4

*Porter v. Clarke,*
    923 F.3d 348 (4th Cir. 2019) ...................................................... 13, 14

*Puckett v. Mitchell,*
    2005 U.S. Dist. LEXIS 37247, (W.D.N.C. Sept. 13, 2015) ............................. 9

*Raynor v. Pugh,*
    817 F.3d 123 (4th Cir. 2016) ...................................................... 9, 16

*Risinger v. Concannon,*
    117 F. Supp. 2d 61 (D. Me. 2000) ............................................... 32, 33

*Roberts v. Pa. Dep't of Pub. Welfare,*
    199 F. Supp. 2d 249 (E.D. Pa. 2002) ............................................... 28

*Ruiz v. Johnson,*
    37 F. Supp. 2d 855 (S.D. Tex. 1999) ............................................... 11

*Scinto v. Stansberry,*
    841 F.3d 219 (4th Cir. 2016) ...................................................... 10

*Scott v. Va. Port Auth.,*
    2018 U.S. Dist. LEXIS 53098 (E.D. Va. Feb. 7, 2018) ................................ 28

*Shakka v. Smith,*
    71 F.3d 162 (4th Cir. 1995) ....................................................... 9

*Skinner v. Liller,*
    No. CV TDC-17-3262, 2021 WL 1062003 (D. Md. Mar. 19, 2021) ...................... 15

*Summit Med. Assocs., v. Pryor,*
    180 F.3d 1326 (11th Cir. 1999). ................................................... 6

*Tellis v. LeBlanc,*
    2019 WL 1474777 (W.D. La. Apr. 3, 2019) ........................................ 32

*Tennessee v. Lane,*
    541 U.S. 509, 523 (2004) ................................................................ 28

*Thorpe v. Va. Dep't of Corr.,*
    2021 U.S. Dist. LEXIS 112284 (W.D. Va. June 15, 2021) ................................. 11, 13, 14

*Todaro v. Ward,*
    565 F.2d 48 (2d Cir. 1977) ................................................................ 19

*Trueblood v. Wash. Dep't Soc. & Health Servs.,*
    2016 WL 10703626 (W.D. Wash. Oct. 13, 2016) ......................................... 34

*United Food v. Brown Group, Inc.,*
    517 U.S. 544 (1996) ................................................................... 33

*United States v. Georgia,*
    546 U.S. 151 (2006) ............................................................... 26, 27

*Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.,*
    2005 WL 3275915 (D.D.C. July 22, 2005) ................................................ 32

*Verizon Maryland, Inc. v Public Service Com'n,*
    535 U.S. 635 (2002) ................................................................... 7

*Virginia Hosp. Ass'n v. Baliles,*
    868 F.2d 653 (4th Cir. 1989) ......................................................... 5, 7, 8

*Wagner v. Warden,*
    No. CIV.A. ELH-14-791, 2015 WL 1276749 (D. Md. Mar. 19, 2015) ...................... 16

*Wilson v. Seiter,*
    501 U.S. 294 (1991) ................................................................... 9

*Wilson v. Thomas,*
    43 F. Supp. 3d 628 (E.D.N.C. 2014) ................................................... 32

**Statutes**

42 U.S.C. § 10801 ........................................................................ 36

42 U.S.C. § 10802 ........................................................................ 36

42 U.S.C. § 10807 ........................................................................ 34

42 U.S.C. § 12112 ........................................................................ 27

42 U.S.C. § 12131 ........................................................................ 24

**Other Authorities**

Restrictive Housing Reform Act: Hearing on House Bill 742: Corrections - Restrictive Housing - Serious Mental Illness - Assessments Before the Judiciary Committee (Feb. 25, 2020), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&clip=JUD_2_25_2020_meeting_1&ys=2020rs. .................................................. 20, 24

Plaintiff Disability Rights Maryland, Inc. ("DRM"), through undersigned counsel, submits this Response in Opposition to Defendants' Motion to Dismiss and states in support:

## I.   **INTRODUCTION**

This case concerns the State of Maryland's prison system, which operates in violation of federal statutory and Constitutional law, inflicts serious harm and a substantial risk of serious harm to incarcerated individuals who have been diagnosed with "serious mental illness" (SMI) because of its segregation policies and practices, and engagement in prohibited disability discrimination.

Within their Motion to Dismiss ("Motion"), Defendants have omitted the law, attempted to redefine Eleventh Amendment exceptions, and ignored Plaintiff's multitude of specific allegations of Defendants' policies and procedures that have led to the substantial risk of serious harm facing inmates with serious mental illness housed in segregation for sometimes for months— even years—without adequate mental health care, access to programs, or basic human rights. Defendants' arguments have no merit.

*First*, Plaintiff's well-pleaded Complaint clearly alleges, in numerous paragraphs, that Defendants' actions continue to violate federal law.  Plaintiff repeatedly seeks relief to enjoin Defendants' policies and practices related to Plaintiff's claim of harm and violations of law.

*Second*, Plaintiff relies on the well-established exception to sovereign immunity when state officials, acting in their official capacities, are violating the Constitutional rights of individuals in their care and custody.

*Third*, Plaintiff asserts sufficient allegations of cruel and unusual punishment and the denial of adequate health care to support claims, especially at this stage of the proceedings, that

Defendants' actions are deliberately indifferent to incarcerated individuals with serious mental illness in segregation, in violation of the Eighth Amendment.

*Fourth*, DRM, an organization established for the sole purpose of protecting the rights of persons with disabilities in the state of Maryland, has standing to sue on behalf of incarcerated persons with disabilities, and to hold otherwise would usurp DRM's legislatively created mission and purpose. Further, DRM is not subject to the Prison Litigation Reform Act and need not exhaust administrative remedies to maintain this action.

*Fifth*, DRM states claims under the Americans with Disabilities Act (ADA), which directly intersect with conduct that is alleged to violate the Eighth and Fourteenth Amendments; the claims are permissible because they are within the scope of Congress's prophylactic enforcement powers to remedy the harms DRM alleges. Moreover, Plaintiff's parallel claims under the Rehabilitation Act are not subject to sovereign immunity defenses (and Defendants make no such assertions).

This Court need not look further than *Disability Rights Montana, Incorporated v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019)[1], in which the Court of Appeals for the Ninth Circuit found that virtually identical factual allegations by Disability Rights Montana were sufficient to withstand a Motion to Dismiss. The same conclusion should be decided here.

## II.     SUMMARY OF DRM'S CONSTITUTIONAL ALLEGATIONS

The Maryland Department of Public Safety and Correction ("DPSCS") placed 812 individuals with serious mental illness in administrative or disciplinary segregation during fiscal year 2019. Compl. ¶ 47. This represented 33.7% of the total prisoner population with serious mental illness. *Id.* There is no time limit for administrative segregation, and some individuals (including those discussed *supra*) remain in this confinement for years. *Id.* ¶ 35; *see also* ¶ 2

---

[1] Although a decision of the Court of Appeals for the Ninth Circuit is not binding on this Court, DRM commends the logic of the Court, and notes that this decision was premised upon similar allegations and nearly identical harms.

(segregation refers to living in a cell approximately the size of a parking space for approximately 22 hours per day or more; cells are made of concrete and steel, have little natural light and possessions are restricted); 36(a) (541 days in segregation); 36(b) (568 days in segregation); 36(c) (889 days in segregation); 50 (at least 1,551 days in segregation). Defendants do not dispute these facts.

The consequences of segregation to people with serious mental illness are substantial. *Id.* ¶ 48. "Individuals with serious mental illness in segregation may decompensate and become increasingly ill, but do not receive necessary treatment." *Id.* ¶ 66. They "experience hallucinations, spread their feces, bang their heads, engage in self-injurious behaviors, are actively psychotic, anxious, or depressed, experience social withdrawal, and/or have committed suicide." *Id.* ¶¶ 3; 62. The limited or non-existent treatment opportunities in segregation cause deterioration in mental health status; delays in recovery; and pose a substantial risk of serious psychological and emotional harm. *Id.* ¶ 60.

Defendants Hill, Green, Bonieskie, Scruggs, Hill, and the DPSCS, "are aware of, have failed to remedy, and are deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm." *Id.* ¶¶ 21; 22; 23; 25. At least three DPSCS facilities, each housing more than 1,000 individuals, had only *one* position filled in each of their respective psychology departments in 2021. *Id.* ¶¶ 76. The "Defendants' identified practices, acts, and omissions have been and continue to be implemented by Defendants." *Id.* ¶ 165.

III.     **LEGAL STANDARD**

Defendants' Motion ignores DRM's well-pleaded, specific allegations of (1) Defendants' segregation practices and procedures relating to inmates with serious mental illness; (2) the

resulting harm and substantial risk of serious harm to individuals with serious mental illness who have withstood weeks, months, and years of harmful segregation practices or are at risk thereof; (3) inadequate mental health care to individuals with serious mental health illness confined to segregation; (4) Defendants' deliberate indifference to the alleged conditions, harms and risk of harm to individuals with serious mental illness in segregation; and (5) Defendants' prohibited disability discrimination. In addition to the specific allegations within the Complaint, Defendants can turn to their *own* data regarding these issues, which is cited extensively throughout DRM's Complaint.

Notwithstanding the fact that DRM's allegations are sufficient on their face, a Rule 12(b)(6) motion should be granted only in limited circumstances. *Cortez v. Prince George's Cty.*, 31 F. App'x 123, 126 (4th Cir. 2002). Such a motion "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). In the context of a 12(b)(6) motion and a civil rights complaint, the Court must be "*especially solicitous* of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Id. See also Pinkett v. Crowder*, No. CIV.A. ELH-13-2509, 2014 WL 3571802, at *6 (D. Md. July 18, 2014).

To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Pinkett*, 2014 WL3571802, at *6 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In other

words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* (citation omitted). There is no doubt Plaintiff's allegations have well-exceeded this requirement.

## IV.    ARGUMENT

Defendants' claim that the *Ex parte Young* exception does not apply because DRM has not sufficiently alleged continuing violations of federal law is grossly misplaced. *See Ex parte Young*, 209 U.S. 123 (1908).

### A.    DRM's Claims are Not Barred by the Eleventh Amendment.

The Eleventh Amendment proscribes suits brought in federal court against a state by a citizen, absent the state's waiver or consent. However, in *Ex parte Young*, the Supreme Court recognized an exception to states' Eleventh Amendment immunity for suits—such as the one that DRM has asserted against Defendants—that "charge state officials with violations of federal law and request prospective relief." *See Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 662 (4th Cir. 1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990); *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001) (the Eleventh Amendment does not preclude suits against "[s]tate officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law"). For the reasons described below, this is the quintessential case, with supporting allegations, that falls under the *Ex parte Young* exception.

### 1.    DRM Has Identified Continuing Violations of Federal Law Committed by Defendants.

The *Ex parte Young* exception applies "when there is an ongoing violation of federal law that can be cured by prospective relief." *DeBauche v. Trani*, 191 F.3d 499, 504–05 (4th Cir. 1999). "[T]he ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, i.e., designed to prevent injury that will occur in the future, and

cases where relief is retrospective . . . Thus, where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied." *Summit Med. Assocs., v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999). Here, DRM has identified many examples of *continuing* violations of federal law by Defendants. *See, e.g.*, Compl. ¶¶ 1 (prohibiting access to programs and services); 21 (deliberate indifference to unconstitutional violations of segregation practices); 34 (no review of segregation required); 35 (no time limit to segregation); 37 (no/limited outdoor time); 60 (denial of mental health care); 62 (denial of healthcare); 70 (denial of necessary mental health services); 121 (failure to remedy violations); 123 (no accommodation of serious mental illness when imposing segregation); 145 (disparate impact and longer sentences for inmates with SMI); 157 (continuance of unconstitutional practices). These violations and others are discussed in additional detail, *supra*.

These allegations, taken as true, are sufficient to prove that Defendants' conduct results in a loss of Eleventh Amendment immunity. *See Blankumsee v. Galley*, 2016 WL 270073, at *6 (D. Md. Jan. 21, 2016) (Prisoner's "claims for prospective injunctive relief for ongoing unconstitutional conduct (his allegedly improper STG designation) shall not be dismissed based on Eleventh Amendment immunity . . . . The state official remains subject to liability if the plaintiff seeks to enjoin the official from engaging in unconstitutional conduct, alleges that the official's violation is ongoing, and requests only prospective relief.").

A plain reading of DRM's Complaint proves that injunctive relief is being sought to stop on-going violations of federal law. DRM seeks "[a]n order enjoining Defendants . . . from engaging in illegal and unconstitutional acts, omissions, policies, and practices by, among other things, enjoining Defendants from placing individuals with serious mental illness in restrictive housing; and requiring Defendants to ensure that individuals with serious mental illness receive

adequate mental health care and services." Compl. ¶ 29. *See McCartney v. Cansler*, 382 F. App'x 334, 337 (4th Cir. 2010) ("In determining whether the *Ex parte Young* exception applies, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."); *Verizon Maryland, Inc. v Public Service Com'n*, 535 U.S. 635, 645 (2002).

### 2. The Requested Relief Would Serve Directly to Bring an End to Present Violations of Federal Law.

Defendants assert that the state is the "real party in interest" to the action, and therefore the *Ex parte Young* exception does not apply. On the contrary, this is "just the sort of action *Ex parte Young* authorized," as it would provide "relief that serves directly to bring an end to a present violation of federal law," and accordingly is not "barred by the Eleventh Amendment even [if] accompanied by a substantial ancillary effect on the state treasury." *Baliles*, 868 F.2d at 662. The *Ex parte Young* exception to a State's sovereign immunity rests on the premise that when a federal court commands a state official to refrain from violating federal law, the official does not constitute the State for sovereign-immunity purposes. "The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State. This was the holding in *Ex parte Young*, in which a federal court enjoined the Attorney General of the State of Minnesota from suing to enforce a state statute that allegedly violated the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). Here, the Complaint requests "[a]n order enjoining Defendants . . . from engaging in illegal and unconstitutional acts, omissions, policies, and practices by, among other things, enjoining Defendants from placing individuals with serious mental illness in restrictive housing; and requiring Defendants to ensure that individuals with serious mental illness receive adequate mental health care and services . . . .". ECF No. 1 at 28. While state interests are almost always implicated

to a certain extent in *Ex parte Young*, the Court recognized "that the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Pennhurst*, 465 U.S. at 105.[2]

Defendants' divergent arguments are unsupported in fact and law. *See, e.g.*, *Baliles*, 868 F.2d at 662 ("The Supreme Court has also repeatedly recognized that 'relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.'") (quoting *Papasan v. Allain*, 478 U.S. 265, 278 (1986)); *Maryland Comm. Health Sys. v. Glendening*, 115 F. Supp. 2d 599, 601 n.2 (D. Md. 2000) ("Other circuits have permitted cases to proceed under *Young* exceptions despite enormous prospective effects on state treasuries."); *Antrican v. Buell*, 158 F. Supp. 2d 663, 668 (E.D.N.C. 2001) ("While an order from the court requiring state officials to comply in the future with federal law might [incidentally] require the expenditure of public funds, the indirect effect on the state treasury does not mean that plaintiffs seek[] money damages for past wrongs."); *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) ("[D]efendants are not immunized from liability arising from ongoing constitutional violations simply because they lack financial resources or the authority to mandate certain specific measures that might remedy the violation. On the contrary, the *Ex parte Young* doctrine allows this court to find liability and ensure that the prison system provides ***minimally adequate*** mental health care.") (emphasis added). The allegations of Plaintiff's Complaint prove far from "minimally adequate" health care.

---

[2] *See also Gibbs v. Pittsburgh*, 989 F.3d 226, 230 (3d Cir. 2021) ("Under the Supremacy Clause, an employer may not shield itself from federal antidiscrimination liability just by saying that it was trying to follow state law")*; EEOC v. Allegheny Cty.*, 705 F.2d 679, 682 (3d Cir. 1983) ("[T]he demands of the federal Rehabilitation Act [or ADA] do not yield to state laws that discriminate against the disabled; it works the other way around."); *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1234 (10th Cir. 2009) (Gorsuch, J., concurring); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (holding that ADA's reasonable modification requirement can modify conflicting state administrative regulation); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir. 2013) (concluding that the ADA's reasonable modification requirement permits "preemption of inconsistent state laws").

**B.     Defendants Violated and Continue to Violate the Eighth Amendment's Prohibition on Cruel and Unusual Punishment (Count I).[3]**

DRM has plausibly alleged violations of the Fourteenth and Eighth Amendments.  "The Eighth Amendment's prohibition on 'cruel and unusual punishments' imposes certain basic duties on prison officials.  These include maintaining humane conditions of confinement, including the provision of adequate medical care and […] reasonable measures to guarantee the safety of the inmates." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (internal citations omitted).  Defendants have violated the Eighth Amendment because they are deliberately indifferent to inmates with SMIs' existing serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Batista*, 930 F.3d at 1101 ("[A]n Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm, and this is met with deliberate indifference to their condition."); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (Eighth Amendment protection against deliberate indifference extends to conditions that threaten to cause health problems in future, as well as current serious health problems).  Defendants have also violated the Eighth Amendment because the conditions of segregated confinement for persons with serious mental illness causes them harm and places them at substantial risk of serious harm.

When considering whether conditions of confinement are cruel and unusual, courts are "guided by contemporary standard[s] of decency." *Puckett v. Mitchell*, 2005 U.S. Dist. LEXIS 37247, at *1 (W.D.N.C. Sept. 13, 2015) (citing *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) Here, the conditions of segregation, and the Defendants' continued failures to provide adequate services and health care for inmates with SMI undoubtedly fail to rise to the level of basic human decency and cause substantial harm and substantial risk of serious harm.

---

[3] The Eighth Amendment is applicable to states through the Due Process Clause of the Fourteenth Amendment and prohibits "cruel and unusual punishment" of those convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991).

Where a plaintiff alleges "systemwide deficiencies, 'policies and practices of statewide and systematic application [that] expose all inmates in [the prison's] custody to a substantial risk of serious harm,'" the deliberate indifference standard is evaluated via a two-pronged inquiry. *Batista*, 930 F.3d at 1098–99; *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("Prisoners that allege that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994)."). The first, objective, prong requires that the plaintiff show that the conditions of the prison pose "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citing *Helling*, 509 U.S. at 25). The second, subjective, prong requires that the plaintiff show that a prison official was deliberately indifferent by being "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," and "also draw[ing] the inference." *Id.* at 837. As shown, the Complaint exceeds both prongs of analysis.[4]

### 1. The Conditions of Maryland's Prisons Pose a Substantial Risk of Serious Harm.[5]

Defendants' policies and practices, both individually and cumulatively, subject individuals with SMI to a substantial risk of serious psychological and physiological harm. The psychological and physiological harms attendant in placing individuals with SMI in segregation are well-documented and widely recognized. *See, e.g.*, Compl. ¶¶ 49–59. In recognition of these potential

---

[4] Defendant's reliance on *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464 (4th Cir. 1999) ("*Five Percenters*"), a case not involving inmates with serious mental illness but rather a case where the use of administrative segregation was linked to threats to prison safety, is misguided. Defendants are also incorrect that *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019) is inapposite. *See Thorpe v. Virginia Dep't of Corr.*, 2021 WL 2435868, at *7 (W.D. Va. June 15, 2021).

[5] The following facilities are the subject of this Complaint: Baltimore City Correctional Center, Dorsey Run Correctional Facility, Eastern Correctional Institution, Eastern Correctional Institution Annex, Jessup Correctional Institution, Maryland Correctional Institution - Hagerstown, Maryland Correctional Institution - Jessup, Maryland Correctional Institution for Women, Maryland Correctional Training Center, North Branch Correctional Institution, Roxbury Correctional Institution, and Western Correctional Institution. Defendant's detention facilities, pre-release centers, and the Patuxent Institution are excluded from this Complaint. *See* Compl. ¶ 24.

(and actual) harms, various mental health and physical health professionals, legal and human rights organizations, correctional institutions, and courts have called for the elimination of, or severe limitation on, the use of segregation for persons with serious mental illnesses. *Id.*

Moreover, there is a national judicial consensus that acts that may exacerbate an inmate's mental illness or increase the risk of suicide or self-harm—such as housing mentally ill inmates in the extreme conditions discussed here—present a substantial risk of serious harm to an inmate with mental illness. *See* Compl. ¶¶ 55; 56; *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("[C]onfinement . . . in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."); *Thorpe v. Va. Dep't of Corr.*, 2021 U.S. Dist. LEXIS 112284, at *18–19 (W.D. Va. June 15, 2021); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1100 (E.D. Cal. 2014) ("[T]he Eighth Amendment prohibits placements of seriously mentally ill inmates in conditions that pose a substantial risk of exacerbation of mental illness, decompensation, or suicide."); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999) ("[A]dministrative segregation is being utilized unconstitutionally to house mentally ill inmates – inmates whose illness can only be exacerbated by the depravity of their confinement"); *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (certifying class where plaintiffs claimed that prison officials' practice of housing prisoners in extreme isolation leads to "psychiatric deterioration, self-injury, and death").

DRM's Complaint asserts that these harms are experienced by persons with serious mental illness in Defendants' custody and has made extensive factual allegations about the effects that the prison's practices have on inmates with serious mental illness in segregation. *See, e.g.*, Compl. ¶¶ 8 (inmates with SMI detained for months and even years in segregation); 44 (out-of-cell practices are woefully inadequate and contribute to the destabilization, deterioration, and lack of recovery for individuals with SMI); 52 (51-months in segregation, A.T. has experienced auditory

hallucinations, increased anxiety, and depression); 53 (reporting that hallucinations and suicidal thoughts occur more frequently and more intensely when in segregation); 54 (1,500 days in segregation, and W.C. decompensated such that he rarely leaves his cell); 83 (worsening symptoms of depression, despite pleas for help to mental health services, no counseling services provided, and E.B. committed suicide); 106 ("startling" lack of mental health staff and programming contributes to Maryland's overreliance on segregation); 125(a) (D.S. struggles to express himself in an appropriate manner due to his mental health issues and is repeatedly placed in segregation as a result of behaviors such as smearing feces, and banging his head on his cell).

These allegations are sufficient to satisfy the objective prong espoused by other federal Courts. In *Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019), the Court of Appeals for the Ninth Circuit considered virtually identical allegations and denied defendants' Motion to Dismiss. In doing so, the Court ruled that

> DRM's complaint contains sufficient factual allegations to make it plausible that the prison's policies and practices pose a substantial risk of serious harm to prisoners with serious mental illness, satisfying the objective element. DRM made extensive factual allegations about the effect that the prison's punishment practices have on prisoners with serious mental illness. DRM's complaint alleged that prisoners with serious mental illness are denied diagnosis and treatment of their conditions, described a distressing pattern of placing mentally ill prisoners in solitary confinement for "weeks and months at a time" without significant mental health care, alleged the frequent, improper use of this punishment for behavior arising from mental illness, marshalled relevant quotations from national prison health organizations about the unacceptability of subjecting prisoners to extensive solitary confinement, and alleged that the defendants did not respond appropriately to threats of suicide by mentally ill prisoners, increasing the risk of suicide. Far from being "a wholly conclusory statement" of its claim, DRM's complaint provides detailed allegations on each of these points, reflecting significant information about the function of the prison and its policies with respect to the seriously mentally ill.

> These allegations, by themselves, were enough to make it plausible that prison policies and practices pose a substantial risk of serious harm. But these allegations make up only a portion DRM's complaint. About half of the complaint included further factual allegations supporting the existence of harmful prison policies and

the risk of serious harm that they pose. There were allegations that the defendants'
policies caused prisoners' mental health to get substantially worse, resulted in
prisoners inflicting self-harm, and contributed, on at least three occasions, to
prisoners committing suicide. To require more would overstate what needs to be
alleged to state a claim at the beginning of a lawsuit before discovery.

*Batista*, 930 F.3d at 1098–99. The result should be no different here.

The Court of Appeals for the Fourth Circuit has held that similar harms suffered in long-

term restricted housing "pose[] an objective risk of serious psychological and emotional harm to

inmates, and therefore can violate the Eighth Amendment." *Thorpe*, 2021 U.S. Dist. LEXIS

112284, at *18–19 (citing *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019)). DRM has outlined

long-standing and ongoing customs and practices that have repeatedly resulted in serious harms to

prisoners with mental illness. These activities have continued during the pendency of this lawsuit

and present an <u>ongoing</u> substantial risk that inmates will suffer such serious harms in the future.

In addition to the deficiencies discussed above, these customs and practices consist of:

- "[F]ail[ing] to ensure that medication intervention is appropriately paired
  with other clinical and program services necessary to provide adequate
  treatment." Compl. ¶ 82.

- "[N]ot require[ing] individualized treatment plans for persons with serious
  mental illness in segregation." *Id.* ¶ 88.

- "[F]ailing to use adequate psychological histories and assessments to
  provide a context and proper diagnosis for individuals with serious mental
  health needs." *Id.* ¶ 90.

- "[S]ystematically fail[ing] to provide the required mental health care to
  individuals with serious mental health illness in segregation." *Id.* ¶ 112.

These allegations suggest a pattern of mistreatment and the threat of these substantial harms

continues.

### 2. Defendants Are Deliberately Indifferent to the Substantial Likelihood of Harm.

According to Defendants, DRM's Complaint fails to satisfy the subjective component of the Eighth Amendment test because DRM fails to "sufficiently plead what conditions should have been provided to particular inmates based upon their unique illnesses and needs," and therefore DRM has not shown that Defendants have been deliberately indifferent. ECF No. 23-1 at 32. To the contrary, DRM has alleged that inmates with serious mental illness—in ***Defendants' own custody***—have been subjected to extreme civil rights violations for which proposed remedies need not go beyond reasonable human logic, Defendants' own admissions or incarceration data, or even Supreme Court precedent. *See, e.g.*, *Helling*, 509 U.S. at 33 ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.").

It can only be assumed that Defendants misunderstand the allegations here. DRM alleges that Defendants' policies and practices of statewide and systemic application expose *all* inmates with serious mental illness in Defendants' custody to substantial risks of serious harm—then take it a step further to identify examples of individuals with SMI in Defendants' custody who have endured discrimination and been subjected to actual harm. DRM has pointed to numerous scientific studies that made the risk of harm "so obvious that it had to be known" by Defendants. *Thorpe*, 2021 U.S. Dist. LEXIS 112284, at *20 (citing *Porter*, 923 F.3d at 361); *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988) ("[T]here is plenty of medical and psychological literature concerning the ill effects of solitary confinement (of which segregation is a variant).").

In addition, Defendants' policies and practices with respect to inmates with mental illness have been the subject of previous lawsuits, legislative hearings, proposed legislative action, and

documented in reports made by the Department of Public Safety and Correctional Services. *See* Compl. ¶¶ 9; 62(a); 62(b); 62(c); 77; 78; 81; 94; 98; 101; 103–116; 132; *Skinner v. Liller*, No. CV TDC-17-3262, 2021 WL 1062003, at *10 (D. Md. Mar. 19, 2021) (denying Correctional Defendants' motion for summary judgment regarding claims of prolonged administrative segregation and inadequate mental health treatment); *Restrictive Housing Reform Act*: *Hearing on House Bill 742: Corrections - Restrictive Housing - Serious Mental Illness - Assessments Before the Judiciary Committee* (Feb. 25, 2020), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&clip=JUD_2_25_2020_meeting_1&ys=2020rs. Indeed, DRM's complaint is based, largely, on Defendants' *own* data. *See id.* In addition, *DRM specifically informed Defendants* of the problems and violations caused by their policies and practices. Compl. ¶ 103. The obviousness of these risks clearly satisfies the subjective component of this test.

Defendants also explicitly acknowledged these harms. ECF No. 23-1 at 32 ("Defendants have in fact made efforts to address the concerns raised by DRM."); Compl. ¶ 132. Defendants' failure to follow their *own* policies provides particularly strong support for the conclusion that they were subjectively aware of the consequences, but nonetheless remained deliberately indifferent to wrongful nature of their actions. Compl. ¶¶ 37 (not receiving out-of-cell time commensurate with Defendants' policies or constitutional obligations); 63 (failure to provide individual treatment plants); 84 (same); 85 (treatment plans contain no criteria by which to measure progress, are not regularly updated, lack specific treatment interventions, and fail to identify individuals responsible for treatment rendering them inadequate). Moreover, Defendants have provided oral and written statements to the Maryland General Assembly indicating that DPSCS would develop programs for persons with serious mental illness and take steps to improve conditions for individuals with

serious mental illness in segregation, as had been recommended by the National Institute of Corrections, upon review of Defendants' segregation practices; but such programs have not been developed. Comp. ¶ 110.

In the face of this admitted knowledge, Defendants unlawfully continue to place seriously mentally ill inmates in inhumane segregation conditions. As segregation places individuals with SMI at a substantial risk (often realized) of harm, the use of such constitutes cruel and unusual punishment that violates the Eighth Amendment. This kind of claim is firmly established in constitutional precedent and does not deserve dismissal. *See Raynor*, 817 F.3d at 127 (vacating dismissal of complaint where prisoner alleged official violated 8th Amendment by failing to protect him from an attack by cellmate); *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (reversing district court's dismissal where plaintiff alleged prison guards failed to protect him from "repeated physical and sexual abuse he suffered while imprisoned."); *Wagner v. Warden*, 2015 WL 1276749, at *8 (D. Md. Mar. 19, 2015) (refusing to dismiss complaint alleging 8th amendment violations where prison guards assaulted plaintiff and denied him medical treatment).

### C. Defendants Fail to Provide Minimally Adequate Mental Health Care to Inmates with Serious Mental Illness, in Violation of the Eighth Amendment (Count II).

"The Eighth Amendment's prohibition against cruel and unusual punishment requires that prisons provide mental health care that meets 'minimum constitutional requirements.'" *Batista*, 930 F.3d at 1097; *see also Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1999) ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart."); *Dunn v. Bishop*, 2018 U.S. Dist. LEXIS 138815, at *28 (D. Md. Aug. 14, 2018) (same); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) ("Even if this case involved failure to provide psychotherapy or psychological counselling alone, the court would still conclude that the psychiatric care was sufficiently similar to medical treatment to bring it within

the embrace of *Estelle*.").  When the level of a prison's mental health care "fall[s] below the evolving standards of decency that mark the progress of a maturing society," the prison fails to uphold the constitution's dignity principles. *Batista*, 930 F.3d at 1097 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)).  Such is the case here.

### 1.  Serious Mental Illness Constitutes a "Serious Medical Need."

Defendants argue that DRM has failed to show a "serious deprivation" of a basic medical need.  ECF No. 23-1 at 31-32.  In making such an argument, Defendants overlook the fact that the Eighth Amendment's prohibition against cruel and unusual punishment requires that prisons provide mental health care that meets "minimum constitutional requirements." *Brown*, 563 U.S. at 501.  "[M]ental health is a need as essential to a meaningful existence as other basic physical demands our bodies may make for shelter, warmth, or sanitation." *Madrid v. Gomez*, 889 F. Supp. 1146, 1261 (N.D. Cal. 1995) (emphasis added).  As alleged by DRM, Defendants' current segregation practices inflict psychological trauma, and in some cases deprive inmates of sanity itself.

Defendants fail to provide minimally adequate mental healthcare to individuals with serious mental illness in segregation in that they fail to: (1) provide necessary treatment opportunities and access to programs (Compl. ¶¶ 64–83); (2) provide individual treatment plans and services (Compl. ¶¶ 84–88); and (3) properly identify/diagnose individuals with serious mental illness (Compl. ¶¶ 89–102).

### 2.  Defendants Are Deliberately Indifferent to the Mental Health Needs of Incarcerated Persons with Serious Mental Illness.

Defendants act with deliberate disregard for the serious mental health needs of inmates in Maryland's prison system.  In cases challenging the entire system of mental health care, courts "have traditionally held that deliberate indifference can be shown by proving either a pattern of

negligent acts or serious systemic deficiencies in the prison's health care program." *Madrid*, 889 F. Supp. at 1256. Here, DRM has plausibly pleaded both.

The situation here is startlingly similar to that considered by the United States District Court for the Northern District of California in *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). In *Madrid*, the Court determined that the delivery of medical and health care at the Pelican Bay prison facility was "riddled with systemic and gross deficiencies – deficiencies which preclude ready access to adequate care," and thus the "defendants' system for providing mental health care . . . fail[ed] to comport with minimum constitutional standards." *Id.* at 1259. Despite this case being more than *twenty-five* years old, systemic deficiencies of the same order plague Maryland's prison system and render it constitutionally inadequate. For example:

- Insufficient staff in Maryland prisons results in inmates "fail[ing] to receive the requisite counseling and programming," and a failure to "enable the safe movement and monitoring of individual with serious mental illness in segregation." Compl. ¶¶ 69; 78. *See Madrid*, 889 F. Supp. at 1256–57 ("Mental health professionals must be employed in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'"); *see also Cabrales v. City of Los Angeles*, 865 F.2d 1454, 1461 (9th Cir. 1988) (understaffing contributed to inmate's suicide due to lack of diagnosis and treatment); *Braggs*, 257 F. Supp. 3d at 1268 "[[P]ersistent and severe shortages of mental-health staff and correctional staff combined with chronic and significant overcrowding," were the "overarching issues that permeate each of the above-identified contributing factors of inadequate mental-health care.").

- Defendants' inadequate screening procedures, which "fail to reasonably assess and account for mental illness" correspond to Defendants "not consider[ing] whether an individual's segregation placement (or status in segregation) is related to their mental health diagnosis and/or attendant clinical manifestations, and [not] consider[ing] whether the individual can be served in an integrated setting that is appropriate to their needs." Compl. ¶ 122. *See Madrid*, 889 F. Supp. at 1222 ("Defendants' complete failure to consider the mental health needs of inmates in making housing decisions seriously compromised the ability of the mental health clinicians to effectively and adequately treat their patients."); *Id.* at 1256–57 ("While a functioning sick call system can be effective for physical illnesses, there must be a 'systematic program for screening and evaluating inmates in order to identify those who require mental health treatment.'") (citation omitted); *Braggs*, 257 F. Supp. 3d at 1201 ("Failure to identify those who need mental-health services denies them access to necessary treatment, creating a substantial risk of harm to those who remain unidentified.").

- "Defendants administer segregation in a manner that discriminates against individuals with serious mental illness by placing them in segregation for reasons related to their mental illness and denying them opportunities for services, including mental health services, that are available to persons not placed in segregation[.]" Compl. ¶ 121. *LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir. 1993) (affirming that systematic denial of access to treatment constitutes deliberate indifference to a serious medical need).

These "systemic deficiencies in staffing, facilities, and procedures make unnecessary suffering inevitable" and provide evidence of deliberate indifference. *See Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977). It is "obvious that the failure to provide such services would cause considerable pain and suffering. Indeed, these facts are so obvious that . . . defendants clearly knew of them." *Madrid*, 889 F. Supp. at 1256, *see also DePaola v. Clarke*, 884 F.3d 481, 488 (4th Cir. 2018) (claim of deliberate indifference to serious mental health needs sufficient for defendants who had notice of severe depression, "hallucinations, acute anxiety, and feelings of hopelessness and helplessness" that required medical attention because of the serious danger posed by these conditions).

Defendants are also "aware that the conditions attendant in restricted housing pose a significant risk to the mental health of inmates, particularly for those who are mentally ill or otherwise at a high risk for suffering mental deterioration . . ." *Madrid*, 889 F. Supp. at 1236. As discussed above, Defendants' *own data* recognizes the risk, and Defendants have considered imposing additional policies, but have failed to do so. *See, e.g.*, Compl. ¶¶ 103-08; 110-12; *Judiciary Hearing Testimony*. Although the prison system continues to lack sufficient mental health care services, "recruitment difficulties do not excuse compliance with constitutional mandates." *Madrid*, 889 F. Supp. at 1227.

At this stage, DRM has plead more allegations than are sufficient to show that inmates with serious mental illness have serious mental health needs, to which Defendants have been/remain deliberately indifferent.

**D.** **Defendants Discriminate Against Incarcerated Individuals with Serious Mental Illness in Segregated Housing by Engaging in Disability Discrimination in Violation of the ADA and the Rehabilitation Act (Counts III and IV).**

Defendants have violated and continue to violate Title II of the Americans with Disabilities Act ("ADA"). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA applies to state prisons, which qualify as public entities for the purposes of the ADA. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also* 42 U.S.C. § 12131(1)(B).

**1.** **Defendants Violated and Continue to Violate Title II of the ADA (Count III).**

DRM clearly states a claim for relief under the ADA. The Parties agree that "[i]n order to state a claim under Title II of the ADA, a plaintiff must show that he is a person with a disability as defined by the statute; that he is otherwise qualified for the benefit claimed to have been denied; and that he was excluded from the benefit due to discrimination based on disability." *Ervin v. Corizon Health*, ELH-21-2386, 2021 WL 5760728, at *4 (D. Md. Dec. 3, 2021) (citing *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016)).

Defendants do not contest that individuals with SMI are qualified "persons" with a disability under the ADA. They instead argue that "DRM's complaint alleges no facts plausibly demonstrating that an inmate was excluded from or denied benefits of any prison services, programs, or activities because of the inmate's disability." ECF No. 23-1 at 11. This is simply not the case. Claims under the ADA and RA may be pursued under three distinct grounds: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir.

2008).  Plaintiff sufficiently alleges claims under each ground.  *See, e.g.*, Compl. ¶¶ 123 ("Defendants administer segregation in a manner that discriminates against individuals with serious mental illness by placing them in segregation for reasons related to their mental illness and denying them opportunities for services, including mental health services, that are available to persons not placed in segregation."); 124 ("Defendants fail to reasonably assess and account for mental illness and do not consider whether an individual's segregation placement (or status in segregation) is related to their mental health diagnosis and/or attendant clinical manifestations, and do not consider whether the individual can be served in an integrated setting that is appropriate to their needs."); 127 ("Defendants' eligibility criteria and methods of administration discriminate against persons with serious mental illness by housing them in segregation . . ."); 162 ("By subjecting individuals with disabilities to unnecessary and punitive segregation . . . Defendants unreasonably and illegally restrict their access to participate in services, programs, or activities); 164 (failure to comply with ADA requirements deprives individuals of access to services and treatment).  Segregation, by its definition, is the exclusion of individuals from prison general population and the services and activities offered therein.  Compl. ¶¶ 2, 5, 7, 11.  These allegations, and reasonable inferences therefrom, sufficiently demonstrate that individuals with serious mental illness are placed in segregation *because* of their disability and denied access to essential programs and treatments *as a direct result* of the segregation.  Compl. ¶¶ 53, 117, 130, 145, 169–72.

"Further, '[a]n ADA claim may proceed on the theory that the Defendant failed to reasonably accommodate the Plaintiffs' disability.'"  *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1241 (N.D. Fla. 2019) (quoting *Lonergan v. Fla. Dept. of Corr.*, 623 F. App'x 990, 992 (11th Cir. 2015)).  The ADA imposes an affirmative duty on Defendants to modify its segregation policies and programs to accommodate individuals with disabilities.

Plaintiff's Complaint makes sustainable claims of violations of the ADA based on Defendants' failure to make reasonable modifications of policies or to offer reasonable accommodations to individuals with SMI subjected to segregation. DRM alleges that Defendants fail to provide accommodations and modifications of policies that would keep individuals out of segregation; and fail to provide the accommodation needed to access to services and programs when in segregation. DRM has identified numerous practices, procedures, and methods of administration in this regard to state valid Title II claims. *See generally* Compl. ¶¶ 121–146. For example:

- "Defendants fail to reasonably assess and account for mental illness and do not consider whether an individual's segregation placement (or status in segregation) is related to their mental health diagnosis and/or attendant clinical manifestations." Compl. ¶¶ 43, 124.

- "Defendants subject individuals with disabilities to segregation, without considering modification or accommodations based on the individualized needs of people with serious mental illness; whether the behavior generating a rule infraction is related to a disability, and whether a sanction or segregation placement could be reasonably modified to provide individuals with SMI access to needed services and programs related to their disabilities." Compl. ¶¶ 122, 125, 129, 130.

- "Defendants' policies and practice of under-identifying individuals with serious mental illness deprive[] such individuals of the accommodations, modifications, and protections promised by the ADA." Compl. ¶ 142.

If the reasonable modifications and accommodations (counseling, programming, mental health treatment, access to medications, etc.) that DRM seeks for individuals with SMI were provided, they would be eligible for the services and programs that they need and to which they claim they are denied access. The positive outcomes from these programs would prevent placement in segregation and the extended periods kept in segregation as a direct result of their disabilities. Compl. ¶¶ 50, 51, 108, 123. These allegations are sufficient to prove a *prima facia* case that individuals with SMI have been excluded from participation in or denied the benefits of the

22

programs, services, or activities of a public entity because of their disability; and that Defendants have failed to make reasonable modifications in policies, practices, and procedures to avoid discrimination and provide opportunities to participate in its programs. 42 U.S.C § 12132; 28 C.F.R. § 35.101 *et. seq*. *See Constantine v. Rectors*, 411 F.3d 474, 499 (4th Cir. 2005) .

DRM also asserts a valid disability discrimination claim of disparate impact. The ADA identifies disparate impact as specifically prohibited disability discrimination. *See* 42 U.S.C. § 12112(b)(6). Defendants' segregation practices have a discriminatory and disparate impact on people with serious mental illness. Plaintiff's claim is supported by data demonstrating that individuals with SMI experience segregation at rates greater than their non-disabled peers and for longer periods of time. Compl. ¶¶ 142–145. Plaintiff also alleges that segregation has a disparate impact on persons with SMI, due to the fact that their mental illness is exacerbated by segregation. Compl. ¶ 145.

Finally, DRM plainly alleges that Defendants fail to provide individuals with SMI services in the most integrated setting appropriate to their needs, in violation of the ADA. Defendants fail to consider an individual's disability and the disability's attendant effects on the behaviors and ability to access needed services or to receive services in the most integrated setting. Compl. ¶ 130(e) (failing to accommodate D.Z.'s disability related behavior so he could receive services in a setting more appropriate to his needs). Segregation, at its core, is not the most integrated setting for inmates with serious mental illness. Compl. ¶ 126.

Many courts have also held that the "[u]nnecessary segregation of individuals with disabilities in the provision of public services is itself a form of 'discrimination' within the meaning of ADA . . ." *Lewis v. Cain*, 2021 U.S. Dist. LEXIS 63293, at *124–26 (M.D. La. Mar. 31, 2021) (citing *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995); *see also Fisher v. Okla.*

*Health Care Auth.*, 335 F.3d 1175, 1181 (3d Cir. 2003) ("[T]he ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled."); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) ("[W]e have made clear that the ADA entitles inmates to receive the 'benefits' of the incarcerating institution's programs and services without facing discrimination on account of a disability."). Indeed, as stated in the Complaint, "by subjecting individuals with disabilities to unnecessary and punitive segregation, without considering modification or accommodations based on the individualized needs of people with serious mental illness, Defendants unreasonably and illegally restrict their access to participate in services, programs, or activities offered by Defendants." Compl. ¶ 129.

In sum, DRM has identified numerous practices, procedures, and methods of administration that have the effect of discriminating against inmates with disabilities, <u>systemic</u> failures by Defendants, *and* provided specific examples of how such policies and practices impact individuals with serious mental illness in segregation, resulting in violations of the ADA. *See generally* Compl. ¶¶ 121–146.

In the face of these many plausible allegations, Defendants can only respond that *one* named individual was offered the opportunity to participate in a prison program, and *one* individual was provided with a (completely deficient) treatment program. ECF No. 23-1 at 12. Defendants appear to suggest that these two examples mean that Defendants (overall) have not violated the ADA. *Id.* DRM disputes Defendants' characterization of the two examples, but more significantly, this argument is not only misplaced and illogical, but it also blatantly ignores the remaining allegations about specific individuals referenced with DRM's Complaint and does not relieve their statutory obligations to all other individuals with serious mental illness that are subject to their discriminatory policies and procedures. *See, e.g.*, *Dunn v. Dunn*, 318 F.R.D. 652, 664

(M.D. Al. 2016) ("[T]here is nothing in the regulation or the case law interpreting it to suggest that the discriminatory effects of a particular method of administration must be uniform in order for the method to be properly subject to challenge."); *see also Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 291 (3d Cir. 2019) ("A prisoner's misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and the PLRA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there."). DRM's claim is not that *no one* could access a specific program but is rather that seriously mentally ill individuals are housed in segregation because of their disability and have access to almost *none* of the programs available to other inmates because Defendants engage in disability discrimination and refuse to provide the needed accommodations and modifications.

### 2. Defendants Violated and Continue to Violate the Rehabilitation Act (Count IV).

Under Section 504 of the Rehabilitation Act, "any state program or activity that receives federal funding must not discriminate on the basis of disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005) . Defendants do not contest that the Department is a public entity that receives federal funds. ECF No. 23-1 at 34 n.7. Indeed, Defendants acknowledge that "[a]cceptance of federal funds under the Rehabilitation Act abrogates Eleventh Amendment immunity." *Innes v. Bd. of Regents of Univ. Sys. of Maryland*, 29 F. Supp. 3d 566, 577 (D. Md. 2014). For the reasons discussed within Section III(D)(1) *above*, DRM has plausibly alleged violations of the Rehab Act. *See id. at* 577–78 (explaining that a "plaintiff seeking recovery for violation of either the ADA or the Rehabilitation Act must allege" the same things, which DRM does). The Supreme Court has determined that individuals with disabilities must be provided with meaningful access to benefits of programming and that the

benefit "cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Here, Defendants have failed to provide inmates with SMI with meaningful access to the benefits of the limited existing healthcare services or programming available to the general population in some DPSCS facilities. And, while Defendants emphasize that a "stronger causation standard" is applicable to Rehab Act Claims, "[i]t is a question for the trier of fact as to whether Defendants discriminated against Plaintiff based solely on her disability." *Id.* at 582 (quoting *Mosier v. Kentucky*, 675 F. Supp. 2d 693, 699 (E.D. Ky. 2009)).

A final determination as to whether a valid Rehab Act claim exists "need not be made now" *Ash v. Maryland Transit Admin.*, No. CV ELH-18-1216, 2019 WL 1129439, at *13 (D. Md. Mar. 12, 2019) ("[G]iven the uncertainty on the issue and the fact that the case will proceed under the [Rehabilitation Act] in any event, final determination whether a valid ADA Title II claim exists need not be made now.") (quoting *Fink v. Richmond*, DKC-07-0714, 2008 WL 9364730, at *8 (D. Md. Mar. 24, 2008)). This issue is best left to the trier of fact and is inappropriate to decide at this stage of the proceedings.

### 3. DRM Has Alleged Facts That Plausibly Demonstrate Violations of the Fourteenth and Eighth Amendments, and Defendants Are Not Entitled to Sovereign Immunity.

The ADA statute forcibly demonstrates Congress' unequivocal intent that under the ADA, "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. In *United States v. Georgia*, the Supreme Court reviewed the language of Title II of the ADA and concluded that it expressed an "unequivocal expression of Congress's intent to abrogate state sovereign immunity." 546 U.S. 151, 154 (2006) (citation

omitted). Based on the Supreme Court's decision in *Georgia*, Courts utilize a three-part test to determine whether sovereign immunity has been abrogated in a particular case and consider: (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.* at 159. Contrary to Defendants' contentions, these three factors all weigh in favor of DRM.

For the reasons discussed in Section III(A)(1) *above*, DRM has alleged facts that plausibly demonstrate violations of Title II of the ADA, the Fourteenth Amendment, and the Eighth Amendment. DRM's ADA claims relate to the placement of individuals with SMI in segregation, in conditions, which violate prohibitions against cruel and unusual punishment and that limit their access to needed services and more integrated setting, and which fail to accommodate their mental health needs causing harm. These claims are coterminous with Plaintiff's claims that Defendant's segregation practices and conditions violate the 8th and 14th Amendments (e.g. segregation practices cause substantial harm by failing to provide adequate mental health care to persons with SMI and denying opportunities to participate in out of cell activities; holding individuals with SMI in segregation based on disability and punishing them for disability related behavior); and within the scope of claims that abrogate sovereign immunity. *Georgia*, 546 U.S. at 158–59 (2006) (holding a paraplegic inmate's Title II claims for money damages were based, at least in part, on conduct that actually violated the Eighth Amendment and thus actually violated Section 1 of the Fourteenth Amendment, including the deliberate refusal of prison officials to accommodate the inmate's disability-related needs in such fundamentals as mobility, hygiene, medical care, and almost all other prison programs).

As Defendants' misconduct violates Title II and the Fourteenth Amendment, the Court need not consider Defendants' argument that Congress' purported abrogation of Defendants' immunity is invalid. ECF No. 23-1 at 24-25. *See, e.g.*, *Roberts v. Pa. Dep't of Pub. Welfare*, 199 F. Supp. 2d 249, 254 (E.D. Pa. 2002) ("[G]iven the [constitutional] violations asserted in the amended complaint . . . . they need not be held up to the 'congruence and proportionality' prism.").[6] To the extent this Court does consider such, the argument is without merit.

### 4. The Requested Relief Correlates to Defendants' Large-Scale Constitutional Violations

This Court need not pass judgment at this stage about "whether the particular relief sought would be appropriate or justified in the instant case, or whether some other prospective relief would be more appropriate." *Scott v. Va. Port Auth.*, 2018 U.S. Dist. LEXIS 53098, at *31 (E.D. Va. Feb. 7, 2018) . This is a fact-intensive inquiry, which is clearly inappropriate for resolution at this time. *Brown*, 563 U.S. at 511 ("Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees.").

If the scope of the requested relief is to be considered at this stage, DRM's requested relief is appropriate considering the seriousness of the violations alleged. *Armstrong*, 622 F.3d at 1072 (discussing the scope of the injunctive relief under the PLRA and explaining that it is "dictated by the extent of the violation established"); *Tennessee v. Lane*, 541 U.S. 509, 523 (2004)("[T]he

---

[6] Numerous courts have held that Title II of the ADA appropriately abrogates state sovereign immunity in the context of state prisons. *See, e.g.*, *Constantine*, 411 F.3d 474 (ruling that Congress effectively and intentionally abrogated the States' Eleventh Amendment immunity from suit under Title II of the ADA in the context of Maryland prison officials); *Latson v. Clarke*, 249 F. Supp. 3d 838, 866 (W.D. Va. 2017) ("To the extent that his ADA claim is based on a failure to accommodate that prevented him from accessing services such as the law library or educational materials, which he apparently could not access while in segregation . . . . Congress validly abrogated the states' Eleventh Amendment immunity as to such claims."); *Armstrong*, 622 F.3d at 1063 ("[T]his court established that the Americans with Disabilities . . . applied to state prisoners, and that defendants' policies and procedures with regard to disabled prisoners and parolees were inadequate and violative of the ADA.").

appropriateness of the remedy depends on the gravity of the harm it seeks to prevent."); *Pierce v. County of Orange*, 761 F. Supp. 2d 915, 947 (C.D. Cal. 2011) ("[I]f the violations are system-wide, even though affecting only a small number of plaintiffs, then relief can be system-wide).

Relief of the nature requested has frequently been considered, and accepted, by courts throughout the country. *See, e.g.*, *Braggs*, 257 F. Supp. 3d at 1268 ("[G]iven the severity and urgency of the need for mental-health care explained in this opinion, the proposed relief must be both immediate and long term. No partial final judgment shall issue at this time as to the claim resolved in this entry."); *Madrid*, 889 F. Supp. at 1280 ("Injunctive or equitable relief is appropriate, and indeed necessary, where there is a 'contemporary violation of a nature likely to continue.'") (citation omitted); *Brown*, 563 U.S. at 511 ("Courts . . . must not shrink from their obligation to 'enforce the constitutional rights of all 'persons,' including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.'") (internal citations omitted).

### E. DRM Has Standing to Enforce the Rights of Its Constituents.

DRM is Maryland's designated Protection and Advocacy ("P&A") agency. As such, DRM is tasked by Congress to "ensure that the rights of individuals with mental illness are protected," and to "protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes[.]" 42 U.S.C. § 10801; *see also* 42 U.S.C. §§ 10807(b); 10805(a)(1)(B); 10802(3). Despite this clear directive from Congress, Defendants argue that DRM lacks the ability to pursue redress for clear violations of DRM's constituents' rights.

### 1. DRM's Unique Role Confers Standing to Bring Suit on Behalf of its Members

To establish associational standing, an organization must show that: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343–45 (1977) (and further discussing that the organization "performs the functions of a traditional trade association"). A non-membership organization, like DRM, can still have associational standing where it possesses the "*indicia*" of membership. *Id.* at 344–45.[7]

At the outset, DRM is the functional equivalent of a voluntary membership organization and DRM's constituents possess the requisite "indicia of membership." *See* Compl. ¶ 20(b)-(n).[8] For example, DRM has a volunteer PAIMI Advisory Council which advises and directs DRM's legal and advocacy work on behalf of persons with mental illness. *Id.* ¶ 20(c), (d). DRM's PAIMI Advisory Council is comprised of a majority of persons who themselves have mental illness or a history of such disability, or who are family members of such individuals. *Id.* The PAIMI Council works closely with the DRM Board to develop and adopt DRM's annual legal advocacy priorities. *Id.; see also* Compl. ¶ 20(e) (public process by which DRM's constituents and public are invited

---

[7] The *Hunt* rationale extends to cases brought by P&As representing individuals with mental illness. See *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) ("Given [the organization's] statutory mission and focus under [PAIMI], its constituents—in this case, the mentally incapacitated defendants—are the functional equivalent of members for the purposes of associational standing"); *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1110–11 (9th Cir. 2003) (same).

[8] Defendants' argument that DRM cannot meet the standard of indicia of membership relies on an apparent circuit split with respect to P&A associational standing, but the cases to which they cite can easily be distinguished. In *Association of Retarded Citizens (ARC) v. Dallas County Mental Health & Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994) the Fifth Circuit held that a P&A lacked the indicia of a membership organization because the clients of the P&A were unable to "participate and guide the organization." *Id.* at 244. The Eighth Circuit echoed this decision, seeming to use the same analysis as the Fifth Circuit. *Missouri Protection and Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007). These cases, however, were not based upon the PAIMI Act, which requires that constituent participation be woven throughout DRM's operations. *See Advocacy Ctr. for Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 583, 591-96 (E.D. La. 2010).

to give input into the most important legal advocacy issues facing persons with disabilities and which issues DRM should focus its resources on over the next year); 20(k) (grievance process). DRM's unique P&A role places it squarely within the construct of *Hunt,* providing standing to associations with indicia of membership.

Regarding the first prong of the *Hunt* test, DRM has demonstrated that its constituents—those whose interests it seeks to protect—would otherwise have standing to sue on their own right. In its Complaint, DRM confirms that its constituents have suffered injuries. *See Doe*, 175 F.3d at 884–85. Indeed, the Complaint is replete with instances of direct harm to inmates with SMI that have been subjected to segregation. Compl. ¶¶ 51, 61, 82, 121, 123. And, DRM alleged that Defendants caused those injuries. Compl. ¶ 149 ("Defendants … have subjected [these and other] incarcerated individuals with serious mental illness to dangerous and degrading treatment, ***caused them serious pain and injury***, placed them at a substantial risk of serious physical harm and psychological injury . . ."). Finally, DRM has alleged that a favorable verdict will likely redress those injuries. *See* Compl. ¶¶ 132–135. In fact, some of DRM's constituents *have* filed actions seeking to redress their conditions of confinement. *See* Compl. ¶ 52 (a), (b).

Defendants do not dispute that DRM satisfies the second *Hunt* prong. The P&A system, and DRM, were created by Congress with the mandate to protect and advocate on behalf of individuals with disabilities. *See* 42 U.S.C. § 10801. The statutes that mandate a P&As authority specifically includes jails and prisons within their scope. 42 U.S.C. §10802(3). DRM has responded to its constituents in the Maryland prison system. *See* Compl. ¶20. DRM has interviewed hundreds of incarcerated individuals and reviewed thousands of pages to respond to its PAIMI Advisory Council and Board of Directors' advice and recommendations that DRM prioritize protection of the rights of individuals with disabilities who are incarcerated. *Id.*

DRM does not need to establish the third *Hunt* factor because it is prudential. Courts throughout the country have held that it is not necessary to include specific individuals in cases where Congress has unambiguously granted authority to a P&A entity to pursue a remedy. *See Mink*, 322 F.3d at 1105; *Cmty. Legal Aid Soc'y v. Coupe*, 2016 WL 1055741, at *2–3 (D. Del. Mar. 16, 2016).[9] Even to the extent DRM was required to establish this *Hunt* factor—which it does not—neither DRM's claim asserted, nor the relief requested, require the participation of individual members in the lawsuit. For example, in *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014), the Court stated:

> Disability Rights seeks the non-discriminatory administration of the driver licensing program to benefit all eligible constituents of Disability Rights and declaratory and injunctive relief furthering that goal. This is clearly relief that does not require the participation of any individuals. Finally, Disability Rights meets the last requirement for associational standing for a non-membership organization because it possesses the "indicia of membership."

*Id.* at 634.

The injunctive and systemic relief that DRM seeks in the way of changes to policies, practices, staff and staff training, are not individualized based on the facts and circumstances of one specific person. DRM is asserting that Defendants' *aggregate* failures to provide adequate mental health care or ADA accommodations to prisoners with mental health disabilities (in

---

[9] *See, e.g., Disability Rts. Cal. v. Alameda*, 2021 WL 212900 (N.D. Cal. Jan. 21, 2021) *Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.*, 2020 WL 1491186, at *8 (M.D. Pa. Mar. 27, 2020); *Disability Rights N.Y. v. New York*, 2019 WL 2497907, at *8 (E.D.N.Y. June 14, 2019); *Tellis v. LeBlanc*, 2019 WL 1474777, at *3–4 (W.D. La. Apr. 3, 2019); *Dunn*, 219 F. Supp. 3d at 1167; *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266 (D. Conn. 2010); *Advocacy Ctr. for Elderly & Disabled v. La. Dep't of Health*, 731 F. Supp. 2d 583, 591–96 (E.D. La. 2010); *Ind. Prot. & Advocacy Servs. Comm'n v. Indiana DOC*, 642 F. Supp. 2d 872, 877–78 (S.D. Ind. 2009) (collecting cases); *Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 395–97 (D. Conn. 2009); *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d 474, 482 –84 (D.N.J. 2008); *Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F. Supp. 2d 553, 563–64 (E.D. Pa. 2007); *N.J. Prot. & Advocacy, Inc. v. Davy*, 2005 WL 2416962, at *2 (D.N.J. Sept. 30, 2005); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.*, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 71 (D. Me. 2000).

violation of the ADA, Eighth Amendment and Fourteenth Amendment) evidence system-wide failures.[10]

### 2. DRM is Not Required to Allege a Particularized Injury on Its Own Behalf

Defendants also argue that DRM must present "concrete and particularized" injury on its own behalf in a civil rights case asserting *associational* standing. In doing so, it is striking that Defendants fail to rely upon any prisoners' rights cases, or even civil rights cases. As discussed in detail above, numerous courts have found that P&As have associational standing to bring suit on behalf of individuals with disabilities, including persons with disabilities in prison segregation. *See, e.g.*, *Cunningham v. BOP*, 222 F. Supp. 3d 959 (D. Colo. 2015) (non-profit organization which received PAIMI allotments had associational standing to bring action against Bureau of Prisons alleging systematic violations of the Eighth Amendment and seeking equitable relief to ensure protection of mental health needs of all prisoners with mental illness).[11] P&A Groups such as DRM have used the doctrine of associational standing countless times to "redress its members' injuries, even without a showing of injury to the association itself." *United Food v. Brown Grp.*, 517 U.S. 544, 551 (1996).

---

[10] Even if this Court were to find that an individualized showing of inadequate mental health care was required, Defendants have frustrated DRM's constituents' attempts to use the ARP process to address their complaints, by responding to individuals with SMI that the ARP process is not the correct forum to address their complaints. *See* Compl. ¶ 115.

[11] P&As are authorized by statute to bring constitutional redress actions on behalf of disabled persons under a number of state and federal laws. *See Ind. Prot. & Advocacy Servs. v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 874 (S.D. Ind. 2009) (P&A has standing to challenge prison segregation of the mentally ill as violating the Eighth Amendment, ADA, and Rehabilitation Act and seeking injunctive relief); *Stincer*, 175 F.3d at 880 (ADA); *N.J. Prot. & Advocacy, Inc. v. Davy*, 2005 WL 2416962, at *4 (D.N.J. Sept. 30, 2005) (due process); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 220–21 (N.D.N.Y. 2002) (Fourth Amendment, ADA, and Rehabilitation Act); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 64 (D. Me. 2000) (unspecified civil rights claims brought pursuant to § 1983); *Goldstein v. Coughlin*, 83 F.R.D. 613, 614 (W.D.N.Y. 1979) (Rehabilitation Act and unspecified constitutional claims).

### 3. Exhaustion of Administrative Remedies is Not Required in this Case

Defendants' contention that the Prisoner Litigation Reform Act ("PRLA") mandates dismissal of Plaintiff's Complaint is not worthy of consideration past the plain reading of the statutory text. 42 U.S.C. § 1997 provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a *prisoner* confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added). The PLRA defines "prisoner" as "any person incarcerated or detained in any facility." 42 U.S.C. § 1997e. As DRM is not a prisoner, nor a person, the PLRA does not apply. *See, e.g.*, *Ala. Disabilities Advoc. Program v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008) ("As [the Alabama Disabilities Advocacy Program] is not a 'person' and has neither been incarcerated nor detained, the prisoner-litigation sections of the PLRA do not apply."); *Trueblood v. Wash. Dep't Soc. & Health Servs.*, 2016 WL 10703626, at *2 (W.D. Wash. Oct. 13, 2016) ("Plaintiff Disability Rights Washington is not a prisoner, is not confined to a correctional facility, and has not been detained as a result of being accused of a crime.") (citations omitted).[12]

## V. <u>CONCLUSION</u>

Federal jurisprudence requires only that a plausible claim be alleged, not that it can be proven with certainty. *Batista*, 930 F.3d at 1101. More than enough facts are plausibly alleged in DRM's Complaint and this matter should not be dismissed without further process.

---

[12] When the remedy that these incarcerated individuals seek mirrors that requested by DRM, exhaustion is not required where it "would be futile or inadequate." *Honig v. Doe*, 484 U.S. 305, 327 (1988). Here, this action seeks systemic relief, and such is not available if an individual succeeds on their specific grievance through the ARP process. Without ceding the applicability of the PLRA, DRM notes that there are individual exemplars noted in DRM's complaint who *have* exhausted administrative remedies—to no avail—under the Prisoner Reform Litigation Act *vis a vie* their ARP filings. Compl. ¶¶ 37(a), 53, 62(c), 128.

Respectfully submitted this 1st day of March, 2022.


_____/s/_____
Luciene Parsley, Federal Bar No. 27089
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Email: MunibL@disabilityrightsmd.org
Telephone: 410-727-6352 ext. 2494
Facsimile: 410-727-6398


_____/s/_____
Munib Lohrasbi, Federal Bar No. 21923
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Email: MunibL@disabilityrightsmd.org
Telephone: 410-727-6352 ext. 2491
Facsimile: 410-727-639


_____/s/_____
Michael L. Hecht, Federal Bar No. 26174
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email:  mhecht@venable.com
Telephone: 410-244-7572
Facsimile: 410-244-7742


_____/s/_____
Thomasina E. Poirot, Federal Bar No. 30090
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email: tepoirot@venable.com
Telephone: 410-244-7574
Facsimile: 410-244-7742

_____/s/_____
Alissa N. Portner, Federal Bar No. 21402
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Email: anportner@venable.com
Telephone: 410-244-7815
Facsimile: 410-244-77